**In re: Appeal of HARLEY–DAVIDSON MOTOR COMPANY.**

**Tax Parcel No. 46–000–K1–0235.00–00000.**

**Municipality: Springettsbury Township Central York School District.**

**Appeal of: Harley–Davidson Motor Company.**

Commonwealth Court of Pennsylvania.

Argued Sept. 12, 2013.

Decided Oct. 30, 2013.

Reargument Denied Dec. 27, 2013.

Richard P. Nuffort, Lancaster, for appellant.

Philip H. Spare, York, for appellee Central York School District.

BEFORE: PELLEGRINI, President Judge, COVEY, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge COVEY.

Harley–Davidson Motor Company (Taxpayer) appeals from the York County Common Pleas Court's (trial court) January 8, 2013 order establishing the assessed values of Taxpayer's real property for tax years 2004–2010.[1] Taxpayer raises four issues for this Court's review: (1) whether the trial court erred by failing to comply with the Second Class A and Third Class

---

1. Although the trial court stated in its Findings of Fact that "[t]he issue before the [c]ourt is the fair market value of the Property for [the] August 1, 2003 [interim assessment], January 1, 2004, January 5 [sic], 2005, January 1, 2006, January 1, 2007, January 1, 2008, January 1, 2009, and January 1, 2010," the trial court's order did not render a determination as to the Property's assessed value for the August 1, 2003 interim assessment. Trial Ct. Op. at ¶ 11.

County Assessment Law,[2] and applying Common Level Ratios (CLRs) to its evaluation of fair market value when it determined assessed value for the applicable tax years; (2) whether the trial court properly applied a "stigma" factor to the market value of the Property to reflect a diminution in value due to environmental contamination; (3) whether the trial court erred when it accepted the taxing authority's appraisal given that the appraiser had identified portions of the Property as excess land, and purportedly affected a subdivision of the tax parcel as to the identified excess land; and (4) whether the trial court committed an error of law in its determination of the highest and best use of the Property. We affirm in part and vacate and remand in part for further proceedings.

Taxpayer is the owner of real property located in York County at 1425 Eden Road, Springettsbury Township, York, Pennsylvania (Property). York County is a third class county. The Property is within the Central York School District (School District) and consists of approximately 229 acres including buildings occupying approximately 1.4 million square feet of gross building area. Approximately 110 acres of the Property contain buildings and other improvements. This includes the Softail Plant that was constructed in 2002.

The United States (U.S.) government used the Property as the York Naval Ordnance plant until 1964 when the American Machinery and Foundry Company (AMFC) purchased the Property and used it as a location to make bomb casings. AMFC eventually merged with Taxpayer and, in 1973, motorcycle manufacturing began on the Property. Military contracting was phased out in the 1980s.

As a result of the prior owners' use of the Property, there were significant environmental impacts such as soil and groundwater contamination and hazardous materials buried on the Property, which include unexploded military ordnances. Pursuant to a 1995 Settlement Agreement (Settlement Agreement) between Taxpayer and the U.S. government, 100% of the environmental cleanup costs are to be paid by Taxpayer (47%) and the U.S. government (53%). The Settlement Agreement also contains a provision stating:

**Successors and Assigns Bound.**

This Settlement Agreement is binding upon and inures to the benefit of the [U.S. government] and Harley and their successors and assigns, however designated. Assignments of claims under this Settlement Agreement shall be in accordance with applicable law.

Reproduced Record (R.R.) at 1427a.

In accordance with the Settlement Agreement, a trust fund has been established and is functioning for the purpose of "collect[ing], maintain[ing] and administer[ing] the funds necessary" for the Property's cleanup. R.R. at 1415a. Taxpayer's Securities and Exchange Commission filings reflect that it has set aside and/or paid the funds required to complete the remediation. Taxpayer is participating in the U.S. Environmental Protection Agency's One Cleanup Program which permits federal standards to be met if the cleanup is conducted pursuant to the Land Recycling and Environmental Remediation Standards Act, Act of May 19, 1995, P.L. 4,

---

2. Second Class A and Third Class County Assessment Law, Act of June 26, 1931, P.L. 1379, 72 P.S. §§ 5342–5350k, repealed by the Act of October 27, 2010, P.L. 895 (Act 2010–93). The Second Class A and Third Class County Assessment Law was replaced by the Consolidated County Assessment Law, 53 Pa. C.S. §§ 8801–8868, effective January 1, 2011. Section 6(1)(i) of Act 2010–93.

35 P.S. §§ 6026.101—6026.908 (Act 2). The Pennsylvania Department of Environmental Protection Model Buyer–Seller Agreement (Model Buyer–Seller Agreement) allows a buyer of contaminated property to be insulated from environmental liability until Act 2 closure is obtained. R.R. at 1388a.

The Property's environmental contamination has been investigated and, although the soil has been fully-characterized, the extent of groundwater contamination has not been finally determined. The groundwater contamination issue is being addressed through groundwater collection and treatment. The Property is serviced by public water. Taxpayer has constructed buildings, roads and parking lots over contaminated areas of the Property.

On October 17, 2003, the Assessment Office of York County issued a Notice of Change in Assessment for the Property raising the assessed fair market value from $10,000,000.00 to $39,229,870.00, effective August 1, 2003. Taxpayer filed an appeal with the York County Board of Assessment Appeals (Board) which, after an April 6, 2004 hearing, confirmed the $39,229,870.00 assessed value.

On June 15, 2004, Taxpayer appealed from the August 1, 2003 interim assessment, the January 1, 2004 assessment and assessments occurring during the pendency of the appeal. Thereafter, York County conducted a county-wide reassessment that, effective January 1, 2006, increased the Property's assessment to $46,147,680.00. By way of an April 30, 2007 Stipulation and Interim Assessment Agreement, the parties agreed to reduce Property's assessed value during the pendency of the appeal to $26,000,000.00, effective July 1, 2006, without prejudice to either party.

Thus, the following assessments were at issue before the trial court:

| | |
|---|---|
| August 1, 2003 Interim Assessment: | $39,229,870.00 |
| January 1, 2004 Assessment: | $39,229,870.00 |
| January 1, 2005 Assessment: | $39,229,870.00 |
| January 1, 2006 Assessment: | $46,147,680.00 |
| July 1, 2006 Interim Assessment: | $26,000,000.00 |
| January 1, 2007 Assessment: | $26,000,000.00 |
| January 1, 2008 Assessment: | $26,000,000.00 |
| January 1, 2009 Assessment: | $26,000,000.00 |
| January 1, 2010 Assessment: | $26,000,000.00 |

A trial was held before the trial court on January 24, 25 and February 1, 2011. The School District intervened in the matter and participated at the trial. Both Taxpayer and School District presented expert testimony regarding the environmental contamination. Sharon R. Fisher, Taxpayer's Environmental Manager, and Ralph T. Golia (Golia), a principal hydrogeologist at AMO Environmental Decisions, Inc., testified on behalf of Taxpayer. The trial court discounted Golia's testimony because he had never completed an Act 2 remediation and his cost estimates were found to be inflated due to his failure to consider the most cost-effective approach.

Stephen B. Fulton (Fulton), Vice President of Environmental Services and Senior Engineer/Geologist at ARM Group, Inc., testified as an expert on behalf of the School District. The trial court credited Fulton's testimony given his significant experience in estimating remediation costs under Act 2 and designing remediation controls. The trial court noted that Fulton's estimated remediation costs were

millions of dollars less than Golia's estimated costs.

Elliot W. Weinstein (Weinstein) testified as a real estate appraisal expert for Taxpayer. Bernard W. Camins (Camins) testified as a real estate appraisal expert for the School District. Both experts considered the three valuation approaches[3] and concluded that the cost approach was not applicable to the Property.

Weinstein produced appraisal reports for 2002, 2004, 2006, 2008 and 2010. In the 2002 report, Weinstein determined the Property's fair market value to be $17,175,000.00, assuming completion of the Softail Plant. His 2004 report issued after completion of the Softail Plant, however, found the Property's fair market value to be only $14,500,000.00. Weinstein also concluded that owner-occupied industrial uses are the highest and best uses of the Property. Weinstein considered only the income capitalization approach in his 2006 and 2008 appraisal report, but ultimately relied upon the comparable sales approach to determine the Property's value. Taking into account the environmental conditions of the Property and deducting a cost to cure those conditions, Weinstein determined the market value of the Property to be as follows:

| Year | Value | Value as Impacted |
|------|-------|-------------------|
| 2003: | $14,500,000.00 | $7,800,000.00 |
| 2004: | $14,500,000.00 | $7,800,000.00 |
| 2005: | $14,500,000.00 | $7,500,000.00 |
| 2006: | $15,000,000.00 | $7,300,000.00 |
| 2007: | $15,000,000.00 | $7,800,000.00 |
| 2008: | $15,000,000.00 | $8,800,000.00 |
| 2009: | $15,000,000.00 | $9,100,000.00 |
| 2010: | $12,500,000.00 | $6,600,000.00. |

R.R. at 77a.

Camins testified to his application of the comparable sales approach and income approach. He concluded that the highest and best use of the Property is for warehouse and office use. He further determined that there was excess land at the front and rear of the Property which was suitable for development. Camins further concluded that the excess 20 acres of land along Route 30 are more valuable than the excess land at the rear of the Property. He also stated that the development and use of the excess land is reasonably foreseeable.

Camins addressed the comparable sales approach, presenting comparable sales consistent with his highest and best use determination, similar in size, type and location to the Property. Of particular

---

3. This Court has noted:
   Section 402(a) of The General County Assessment Law (Assessment Law), Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020–402(a), identifies three methods of property valuation that must be considered in conjunction with one another when arriving at fair market value for assessment purposes: cost approach, income approach and comparable sales approach. The cost approach considers reproduction or replacement costs of the property, less depreciation and obsolescence. The income approach determines fair market value by dividing the subject property's annual net rental income by an investment rate of return. The comparable sales approach compares the subject property to similar properties with consideration given to size, age, physical condition, location and other factors.
   *Jackson v. Bd. of Assessment Appeals of Cumberland Cnty.*, 950 A.2d 1081, 1084 n. 1 (Pa. Cmwlth.2008) (citations omitted).

note was his testimony regarding the Caterpillar Plant (Plant) also located in Springettsbury Township, York County. The Plant consisted of approximately 210 acres of land with a 1,538,500 square feet manufacturing plant and a 1,075,461 square feet distribution facility. The Plant was sold in December 2000 for $11.09 per square foot of gross building area. The manufacturing plant was resold in September 2002 for $5.85 per square foot. The distribution facility was resold in September 2003 for $35.57 per square foot of gross building area. The manufacturing plant was resold in January 2008 for $45.50 per square foot of gross building area.

Using the comparable sales approach, Camins determined that the market value of the primary site for tax years 2004–2007 was $19,500,000.00 and the market value for the excess land during that same period was $5,175,000.00, after deducting 25% for a developer's profit. Camins further opined that the aggregate market value of the primary site and excess land for tax year 2008 was $26,475,000.00, for tax year 2009 was $24,375,000.00, and for tax year 2010 was $18,075,000.00.

Camins also testified regarding his use of the income capitalization approach in making his valuation determination. Camins explained that he divided the Property into categories, and determined the potential leasing income for the office space, warehouse and industrial areas. Camins stated that he hired an expert, George L. Claflen (Claflen), to evaluate the necessary modifications or demolitions to the Property for leasing. Claflen testified to a reasonable degree of certainty regarding the need for certain modifications and demolitions in order to maximize the Property's leasing potential.

Camins concluded that pursuant to the income capitalization approach, the aggregate market value of the primary site and

excess land, unaffected by environmental conditions, for tax years 2004 through 2007 was $24,225,000.00, for 2008 was $27,600,000.00, for 2009 was $25,650,000.00, and for 2010 was $18,600,000.00. These values included a developer's profit adjustment.

Considering both the comparable sales approach and income capitalization approach, Camins testified that the Property's market valuation, as unaffected by environmental conditions, for tax years 2004 through 2007 was $24,500,000.00, for 2008 was $26,500,000.00, for 2009 was $24,500,000.00, and for 2010 was $18,000,000.00. These totals reflected a 5% "stigma" deduction in consideration of the Property's environmental condition.

In its January 8, 2013 order, the trial court found Camins' testimony credible and that his conclusions were based upon the present condition of the Property and the Property as a whole, rather than as if it had been subdivided. In addition, the trial court determined that Camins' appraisal did not constitute an impermissible hypothetical subdivision of the Property, and that it was appropriate for Camins to consider the market value of the primary site and the market value of the excess land in his appraisal. Further, the trial court agreed with Camins that the highest and best use of the Property was warehouse and office use with the excess land being suitable for development. Finally, it concluded that Camins' comparable sales were similar to the Property in size, type and location, and matched the highest and best use of the Property.

In contrast, the trial court did not find Weinstein's testimony credible, determining that Weinstein's appraisal reports and the impact of the environmental conditions were inconsistent, and his conclusion regarding the highest and best use of the Property was in error. The trial court

further deemed Weinstein's comparable sales to be less credible than Camins', and opined that Weinstein's conclusions based upon the income capitalization approach were not credible given his failure to explain the income capitalization rates, errors in his 2008 reports regarding the effecting tax rate, and his determination that the Property is in a rural location. Of particular concern to the trial court was Weinstein's "cost-to-cure" value. In addition to not adequately explaining the "cost-to-cure" value, the trial court found the "cost-to-cure" value faulty in that the environmental damage was used to determine the deduction to be made from the market value, despite the fact that the Settlement Agreement provides that only Taxpayer and the U.S. government are responsible for the remediation costs, and that a purchaser would not be responsible for the costs to cure the environmental damage.

Based upon the evidence, the trial court established the Property's assessed value as follows:

| | |
|---|---|
| For tax years 2004–2007 | $24,500,000.00 |
| For tax year 2008 | $26,500,000.00 |
| For tax year 2009 | $24,500,000.00 |
| For tax year 2010 | $18,000,000.00 |

In finding the aforementioned assessed values, the trial court did not discuss or demonstrate its adherence to Section 9 of the Second Class A and Third Class County Assessment Law, 72 P.S. § 5350.

■ Taxpayer first argues that the trial court failed to comply with the Second Class A and Third Class County Assessment Law,[4] which requires the trial court to determine market value and then apply the CLR to that determination in order to arrive at the Property assessment for each year in question. We agree.

■ Prior to January 1, 2011, the General County Assessment Law (Assessment Law) and the Second Class A and Third Class County Assessment Law governed the County's assessment of real estate taxes.[5] Section 402(a) of the Assessment Law, 72 P.S. § 5020–402(a), requires property to be assessed at its "actual value". This Court has held:

Actual value means fair market value and, in turn, fair market value is defined as a price which a purchaser, willing but not obliged to buy, would pay to an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied.

4. Section 7(2) of Act 2010–93 states, in pertinent part, that "all activities initiated under the [Second Class A and Third Class County Assessment Law] shall continue and remain in full force and effect and may be completed under [the Consolidated County Assessment Law]." This Court held in a similar case involving a 2007 assessment pending when the Consolidated County Assessment Law became effective, that because the case arose prior to January 1, 2011, it was governed by the Second Class A and Third Class County Assessment Law. See Cryan (EA Media) v. Snyder Cnty. Bd. of Assessment Appeals, 29 A.3d 873 (Pa.Cmwlth.2011).

5. "[B]oth of those laws apply except where the [Second Class A and] Third Class County Assessment Law is inconsistent with the provisions of the [Assessment Law]." Truck Terminal Motels of Am., Inc. v. Berks Cnty. Bd. of Assessment Appeals, 127 Pa.Cmwlth. 408, 561 A.2d 1305, 1307 (1989). Pursuant to the Assessment Law, where there is inconsistency, the Second Class A and Third Class County Assessment Law applies. 72 P.S. § 5020–105.

*1198 Butler St. Assocs. v. Bd. of Assessment Appeals, Cnty. of Northampton*, 946 A.2d 1131, 1137 (Pa.Cmwlth.2008) (quotation marks omitted). Section 402(a) of the Assessment Law specifies: "In arriving at the actual value, all three methods, namely, cost (reproduction or replacement, as applicable, less depreciation and all forms of obsolescence), comparable sales and income approaches, must be considered in conjunction with one another...." 72 P.S. § 5020–402(a).

■■■ "In a tax assessment appeal, the burden initially is on the Board, which it satisfies by presenting its assessment records into evidence." *Expressway 95 Bus. Ctr., LP v. Bucks Cnty. Bd. of Assessment*, 921 A.2d 70, 76 (Pa.Cmwlth.2007). Although a property's assessment record is *prima facie* evidence for an assessment's validity,

> once the taxpayer produces sufficient proof to overcome its initially allotted status, the *prima facie* significance of the Board's assessment figure has served its procedural purpose, and its value as an evidentiary devi[c]e is ended. Thereafter, such record, of itself, loses the weight previously accorded to it and may not then influence the court's determination of the assessment's correctness.

*Green v. Schuylkill Cnty. Bd. of Assessment Appeals*, 565 Pa. 185, 195, 772 A.2d 419, 425–26 (2001) (quoting *Deitch Co. v. Bd. of Prop. Assessment, Appeals & Review of Allegheny Cnty.*, 417 Pa. 213, 221, 209 A.2d 397, 402 (1965)). This Court has recognized:

[I]t is not enough to merely present evidence from a qualified expert. The evidence must be *sufficient to rebut* the validity of the assessment which means the evidence must be (1) believed in the sense that the trial court accepts the veracity of the expert based on, for example, his demeanor; and (2) relevant and competent in the sense that it is not dubious, but legally and factually sound so that it is of practical value to the court in its effort to arrive at the fair market value. Of course, only the latter is reviewable by this Court[.][ [6] ]

*Craftmaster Mfg., Inc. v. Bradford Cnty. Bd. of Assessment Appeals*, 903 A.2d 620, 627 (Pa.Cmwlth.2006). Thus, where there was competent evidence to support an expert's testimony of a number different from the assessment, the official assessment is no longer entitled to a presumption of correctness. "The trial court's findings must be given great force and will not be disturbed unless clear error appears." *Appeal of Harrisburg Park Apartments, Inc.*, 88 Pa.Cmwlth. 410, 489 A.2d 996, 997 (1985) (quotation marks omitted).

■■■ This Court has held that when making findings in an assessment appeal, **"the trial court must state the basis and reasons for its decisions,** regardless of whether one expert or multiple experts testify." *Herzog v. McKean Cnty. Bd. of Assessment Appeals*, 14 A.3d 193, 200 (Pa. Cmwlth.2011) (emphasis added). "[T]he **trial court's reasoning must be stated on the record** so that the reviewing court may determine if the trial court's depar-

---

**6.** The trial court concluded that Taxpayer's expert, Weinstein, was not credible and that "[t]he reports and testimony of Mr. Weinstein contained many inconsistencies and errors. [Taxpayer] has therefore failed to meet its burden of producing sufficient, credible, competent and relevant evidence and has not persuaded the Court as to the merits of its

Appeal[.]" Trial Ct. Op. at ¶¶ 66, 74. Notwithstanding, the trial court proceeded to evaluate the case based upon both parties' expert testimony, rather than ruling Taxpayer had not overcome the *prima facie* significance of the Board's initial assessment. *See Green*.

ture from the expert's valuation is warranted." *Green*, 565 Pa. at 208, 772 A.2d at 433 (quotation marks omitted; emphasis added).

Section 9 of the Second Class A and Third Class County Assessment Law provided:

(a) In any appeal of an assessment the court shall make the following determinations:

(1) The market value as of the date such appeal was filed before the board of assessment appeals. In the event subsequent years have been made a part of the appeal, the court shall determine the respective market value for each such year.

(2) The common level ratio which was applicable in the original appeal to the board. In the event subsequent years have been made a part of the appeal, the court shall determine the respective common level ratio for each such year published by the State Tax Equalization Board on or before July 1 of the year prior to the tax year being appealed.

(a.1) The court, after determining the market value of the property pursuant to subsection (a)(1), shall then apply the established predetermined ratio to such value unless the corresponding common level ratio determined pursuant to subsection (a)(2) varies by more than fifteen percent from the established predetermined ratio, in which case the court shall apply the respective common level ratio to the corresponding market value of the property.

(a.2) When a county has effected a county wide revision of the assessment which was used to develop the common level ratio last determined by the State Tax Equalization Board, the following shall apply:

(1) If a county changes its assessment base by applying a change in predetermined ratio, the court shall apply the percentage change between the existing predetermined ratio and newly established predetermined ratio to the county's common level ratio to establish the certified revised common level ratio for the year in which the assessment was revised.

(2) If the county performs a countywide revision of assessments by revaluing the properties and applying an established predetermined ratio, the court shall utilize the established predetermined ratio instead of the common level ratio for the year in which the assessment was revised and until such time as the common level ratio determined by the State Tax Equalization Board reflects the revaluing of properties resulting from the revision of assessments. 72 P.S. § 5350.

The trial court's yearly **assessed values** are identical to Camins' reconciled sales comparison/income approach **market values**. There is no indication in the trial court's opinion that it complied with the procedure set forth in Section 9 of the Second Class A and Third Class County Assessment Law. Instead, the trial court's opinion appears to have adopted Camins' **market values** as the **assessed values**. Because the trial court did not adequately state the reasons for its assessed value determinations, and because it appears the trial court did not comply with Section 9 of the Second Class A and Third Class County Assessment Law, this matter must be remanded to the trial court so it may do so.[7]

---

7. Taxpayer notes that the parties stipulated to the CLRs for all but two of the years at issue in this appeal and raises the issue of a dispute over the proper applicable CLR for the year beginning January 1, 2007. Section 9 of the Second Class A and Third Class County As-

■ Taxpayer next asserts that the trial court erred when, despite evidence of significant environmental contamination to the Property, it adopted Camins' 5% "stigma" devaluation factor, rather than using a cost-to-cure approach. We agree that the trial court erred when it adopted the 5% devaluation factor.

■ It is well-established that:

In an assessment appeal, the trial court hears the matter *de novo* and, accordingly, is the ultimate finder of fact. The trial court has the discretion to decide, based on the testimony of competent witnesses, which valuation method to use to value a particular property. The trial court has exclusive province over all matters of credibility and evidentiary weight. The trial court's findings will not be disturbed if they are supported by substantial evidence in the record. Nevertheless, the trial court must state the basis and reasons for its decision. If an appraiser uses an improper factor when fixing the fair market value of real estate, his opinion is not substantial evidence that can support a finding of value.

*Grand Prix Harrisburg, LLC v. Dauphin Cnty. Bd. of Assessment Appeals*, 51 A.3d 275, 280 (citations and quotation marks omitted).

This Court has recognized that "environmental contamination is relevant to determining fair market value of real estate for property tax purposes." *B.P. Oil Co., Inc. v. Bd. of Assessment Appeals of Jefferson Cnty.*, 159 Pa.Cmwlth. 414, 633 A.2d 1241, 1243 (1993). In *B.P. Oil*, the trial court held that the taxpayer had failed to offer sufficient proof to overcome the Board's

assessment. On appeal, this Court considered the evidence offered by the taxpayer:

At the hearing before the trial court, the [taxpayer] introduced unrebutted expert testimony showing that the groundwater and soil under the property was contaminated and that the contamination was caused by leaks from underground fuel tanks. The expert testified that it would take five years to clean up the contamination at a cost of approximately $653,370.00. Also, the [taxpayer] produced the testimony of a real estate appraiser who testified that the contamination was a form of economic depreciation that had a negative impact on the property's fair market value. The appraiser testified that the fair market value of the property in its contaminated state should be calculated using the 'cost approach.' Under the cost approach, the fair market value of the property is calculated by subtracting the cost to cure the contamination from the value the property would have if it were not contaminated. The appraiser testified that the fair market value of the property in an uncontaminated state was $1,586,833.00; subtracting the $653,370.00 needed to cure the contamination from that figure reduces the fair market value of the property to $933,630.00.

*Id.* This Court concluded that based on the above, the taxpayer had produced sufficient evidence to overcome the assessment's *prima facie* validity and thus, remanded the matter to the trial court directing it "to determine whether the Board's valuation of the Property was excessive in light of the groundwater and soil contamination. If the trial court con-

sessment Law, repealed by Act 2010–93, provides that it is the **trial court's** responsibility to determine the CLR for each year at issue. *See* 72 P.S. § 5350(a)(2). Thus, this issue is

not an appropriate determination for this Court, and is one to be made by the trial court on remand.

cludes that the assessment is excessive, it must determine the fair market value in its contaminated condition." *Id.; see also Craftmaster.*

Notably, the *B.P. Oil* case did not specifically endorse a cost-to-cure method for devaluation. Instead, the case merely recognized that in assessing a property with environmental contamination, contamination is a relevant fact to consider when determining the fair market value. Here, the trial court declined to accept Weinstein's cost-to-cure value because it found Taxpayer's expert's estimates to be excessive, and according to the trial court, "per the 1995 Settlement Agreement, the [U.S. government] and Harley–Davidson are the only Parties responsible for environmental remediation costs and the purchaser would not be responsible for the costs to cure the environmental damage." Trial Ct. Op. at ¶ 73.

As noted by Taxpayer, although the Settlement Agreement provides for the costs of remediation to be paid by the U.S. government and Taxpayer, even given the existence of the Settlement Agreement, there are possible scenarios that could result in remediation liability being imposed upon a prospective purchaser. For example, notwithstanding the Settlement Agreement imposes responsibility for the cost of remediation upon the U.S. government and Taxpayer, and the Model Buyer–Seller Agreement would release a purchaser from liability, the Model Buyer–Seller Agreement does impose certain restrictions and responsibilities **upon the purchaser.** These include restricting the use of the Property for commercial or industrial activity (precluding its use for a school, nursing home or other residential-style facilities and recreational areas), imposing an obligation upon the buyer to maintain engineering controls, and requiring the buyer to avoid disturbing subsurface strata

and soils. It further imposes reporting requirements upon the buyer and permits DEP to order a purchaser to cease activities at the Property if the seller fails to complete remediation by a certain date. R.R. at 1397a–98a.

Both appraisers and the School District's expert environmental witness agreed that the environmental condition of the Property impacted its value. The factual question to be determined is how much the fair market value has been impacted. As Taxpayer asserted, the evidence demonstrated that the impact upon the Property is more than just a "stigma." However, it appears that the trial court completely disregarded these and other factors demonstrating actual impact upon the Property's fair market value when it adopted a "stigma" devaluation, to the exclusion of other factors. *See Craftmaster,* 903 A.2d at 633. ("[The trial court cannot ignore] the [p]roperty's current reality and the existing negative impacts associated with it, **including** negative stigma, environmental impacts and statutory and regulatory clean-up costs.") (Emphasis added).

Rather than apply a cost-to-cure method, the trial court accepted Camins' application of the 5% "stigma" devaluation which was based upon the presumption that due to the Settlement Agreement, a purchaser would have no liability for remediation. Although there is reference in the trial court's opinion to Camins' reliance on his expert's testimony regarding remediation costs, there is nothing in the trial court's opinion evidencing how Camins came to the 5% devaluation figure and why the Court adopted it. In fact, as demonstrated below, it is clear from Camins' testimony that there was simply no supportable basis for the 5% figure:

Q. [Taxpayer's counsel] How did you factor that into your land value adjustment?

A. [Camins] In analyzing issues[,] we value the property. The first report there was no mention in the first report of any adverse environmental concerns and valuation was predicated upon that presumption.

. . . .

Q. My point is now that you have learned so much more?

A. Yes.

Q. Doesn't that indeed result in some changes in your opinion on the value of that excess land?

A. Not at all. It merely reinforces what we had initially.

Q. You changed at least 5 percent. You gave a 5 percent stigma?

A. Yes, we did that for all of them for 2003 going forward.

Q. But what's the stigma?

A. Stigma is intangible.

Q. **How do you value it?**

. . . .

A. **You don't.**

Q. Why isn't it 10 percent or 20 percent or 30 percent?

A. What stigma is really—is really kind of a very rough perception that some people have. Say, well if I buy a site that didn't have any problems in the past, even if it's not going to cost me any money compared to a site that has had them, even though—or a site that hasn't had them, I'll try to negotiate and pay less and that 5 percent adjustment was an adjustment made to reflect that intangible perception from a market perspective.

Q. Well, based on what data?

. . . .

A. **As a matter of fact there are almost no data available dealing with stigma.** The methodology that is often suggested is in certain cases when it did occur, what was the nature of what it was, what type of property is it. Industrial properties seldom—stigma is not a major thing with industrial property. It's more applicable with residential. It has a greater effect.

R.R. at 299a–300a (emphasis added). The trial court accepted Camins' testimony as credible and adopted Camins' fair market value which included the 5% "stigma" devaluation. However, the above testimony demonstrates that the application of the 5% "stigma" devaluation was no more than an arbitrary figure; **in essence, it was a guess.**

The Pennsylvania Supreme Court has stated:

An expert cannot base his opinion upon facts which are not warranted by the record. **No matter how skilled or experienced the witness may be, he will not be permitted to guess or to state a judgment based on mere conjecture.** In *Dreher v. Order of United Commercial Travelers of America*, 173 Wis. 173, 180 N.W. 815, 817 (1921), the Court stated: 'It is the function of opinion evidence to assist the jury in arriving at a correct conclusion upon a given state of facts. To endow opinion evidence with probative value it must be based on facts proven or assumed, sufficient to enable the expert to form an intelligent opinion. The opinion must be an intelligent and reasonable conclusion, based on a given state of facts, and be such as reason and experience have shown to be a probable resulting consequence of the facts proved. The basis of the conclusion cannot be deduced or inferred from the conclusion itself. *In other words, the opinion of the expert does not constitute proof of the existence of the facts necessary to support the opinion.*' (Emphasis added).

*Collins v. Hand,* 431 Pa. 378, 390, 246 A.2d 398, 404 (1968) (bolded emphasis added). In *Topflight Corporation v. Workmen's Compensation Appeal Board,* 92 Pa. Cmwlth. 451, 499 A.2d 415 (1985), this Court, citing *Collins,* concluded that the Workmen's Compensation Appeal Board (Board) properly vacated a referee's decision and order on the ground that the referee's findings were based on equivocal expert testimony. Because the Court found that the expert "had no basis in the facts for his opinion," the Court noted that it was proper for the Board to have "revers[ed] a referee's decision and remand when the referee's findings [were] unsupported by substantial evidence of record...." *Topflight Corp.,* 499 A.2d at 418. Similarly, in the instant action, the trial court's acceptance of Camins' 5% "stigma" devaluation was error because Camins' opinion was not "based on a given state of facts." *Collins,* 431 Pa. at 390, 246 A.2d at 404. The aforementioned case law is clearly contrary to the Concurrence/Dissent's statement "that all experts' testimony about anything are guesses but expert guesses which transform them into opinions...." Concurring and Dissenting Op. at 524. Camins' guess of a 5% "stigma" devaluation "**does not constitute proof of the existence of the facts necessary to support the opinion.**" *Id.* (emphasis added).

Because Camins "use[d] an improper factor when fixing the fair market value of real estate, [this Court finds] his opinion is not substantial evidence that can support a finding of value." *Grand Prix Harrisburg, LLC,* 51 A.3d at 280. Moreover, the trial court did not explain its rationale for applying the 5% "stigma" devaluation figure, and did not adequately state the basis

for its decision as required by *Grand Prix Harrisburg, LLC.* Thus, the trial court's imposition of an arbitrary devaluation percentage based solely on stigma was error. Accordingly, upon remand, the trial court shall, based upon the record evidence, determine the impact of the environmental conditions upon the Property's fair market value.[8]

Taxpayer next contends that the trial court erred when it accepted Camins' appraisal approach to valuation because the valuation was based on a legally impermissible hypothetical subdivision of the Property, and the land subdivided was incorrectly deemed excess land. We agree.

The appellate courts of this Commonwealth have held that reasonably foreseeable prospects for a property which exist at the time of an assessment may be considered in determining a property's fair market value, e.g.—its probable use, lease or sale. However, consideration of factors based upon pure speculation, such as what the property would be worth in an altered condition are irrelevant to the issue of fair market value.

In other words, hypothetical ways in which the property could be used by potential buyers should be considered in determining what a willing buyer would pay for the property. That is not to say, however, that the property should be valued as though it were already in that hypothetical condition. For instance, a large farm may have greater potential value if the land were subdivided into one acre lots for single family homes, but while that *potential* must be consid-

---

8. This Court's finding of error should not be read to either **prohibit or require** the application of the "cost-to-cure" method in determining environmental impact. However, the trial court's conclusions regarding the environmental impact must be based upon substantial evidence and its reasons therefor clearly explained in its opinion.

ered, the property may not be taxed as though it were currently subdivided and developed. Accordingly, even if the trial court had accepted the opinion of the County's expert that subdivision was the highest and best use, it would have been error to value the property as though it were, in fact, two separate parcels.

*Air Prods. & Chems., Inc. v. Bd. of Assessment Appeals of Lehigh Cnty.*, 720 A.2d 790, 793–94 (Pa.Cmwlth.1998) (citations omitted).[9]

Taxpayer relies upon *Craftmaster* in support of its argument that Camins' appraisal approach was based upon a legally impermissible hypothetical subdivision of the Property. In *Craftmaster*, Bradford County issued an assessment for a manufacturing facility on a 290–acre parcel of real estate, consisting of approximately 35 buildings and also including 198 acres of land on which were located a sewage treatment facility, a spray field, monitoring wells, and a fiber storage landfill. After the taxpayer offered expert testimony and rested, the County's expert witness testified that he:

> viewed the Property as three separate tax parcels and assigned separate values as to (1) what he considered to be 'excess land', (2) non-industrial buildings, and (3) the main industrial plant, which comprised 55 acres and was enclosed by a six-foot high fence. It was [the County's expert's] opinion that the separate and distinct nature of each of these three aspects of the Property justified that they be assigned separate values.

*Id.* at 624 (footnote omitted). On review, this Court relied upon *Air Products,* ruling:

> [The County's expert] ... employed a comparable sales analysis (using the recent sale of residential homes in the

area) and assigned a separate value to the structures, hypothetically, as though they were already in the altered, subdivided condition, much like the board's expert did in *Air Products.* This Court does not agree that [the County's expert's] opinion represented a 'reasonably foreseeable prospect' for the Property which existed at the time of his assessment. Although he couched his opinion in terms of the 'probable' market value, there was no evidence that [the taxpayer] had any present (or future) intention of selling those structures as residences. In fact, the evidence indicated that the reason that the owners sold their homes in the first place was because of their undesirable location next to the plant. There was also no indication that the Property, which was located in an industrial zoning district, would or could be subdivided and rezoned residential. [The County's expert's] opinion was purely speculative and the precise type of valuation testimony proscribed by *Air Products* and *Gilmour [Properties v. Board of Assessment Appeals of Somerset County,* 873 A.2d 64 (Pa.Cmwlth. 2005) ]. [The County's expert] should have based his value on the Property 'as is', rather than its value when configured into its hypothetical highest and best use.

*Craftmaster,* 903 A.2d at 631–32 (citation omitted).

Here, Taxpayer argues that Camins hypothetically subdivided the Property when he separately valued the 20 acres of excess land at $1,500,000.00 (20 acres × $75,000.00) and the 98.7 acres at $5,428,000.00 (98.7 acres × $55,000.00). R.R. at 1079a. Camins' subsequent report later increased those values to $1,566,000.00 and $5,724,600.00 respective-

9. *Superseded by statute,* 53 Pa.C.S. § 8426(a).

ly. R.R. at 1168a. Camins based his valuation of the excess land on comparable land sales; however, none of the sales were sales of excess land or surplus land of a manufacturing facility sold off in bulk. Taxpayer also argues that the following facts demonstrate that Camins' assessment was based upon the impermissible subdivision of the Property: (1) Camins' statement that "the large size of the site suggests subdivision of the land could occur." R.R. at 1040a; (2) Camins' conclusion that "the buildings could be sold in bulk or subdivided and sold to various users." R.R. at 1040a; (3) Camins' statement that "there is a significant amount of excess land, east and south of the main buildings that have the potential for subdivision." R.R. at 1041a; (4) Camins' conclusion that "[t]he area north and east of the Softail plant ... contains 98.7 acres ... [that] could be subdivided into smaller parcels, which would be suitable for warehouse and distribution type uses." R.R. at 1041a; (5) Camins' statement that "assuming subdivision could occur, the buildings of significant size and utility ... could be sold separately as could the considerable amount of excess land." R.R. at 1044a; and, (6) The Exhibit–Addenda Drawing attached to Camins' appraisal report which specifically designated the excess areas as "Area One" and "Area Two." R.R. at 1103a.

It is well-established that "[t]he trial court is the finder of fact, determining the weight to be given to an expert witness's testimony regarding valuation. The trial court's findings are entitled to great deference and the trial court's decision will not be disturbed unless there is clear error." *Appeal of Cynwyd Investments*, 679 A.2d 304, 307 n. 1 (Pa.Cmwlth.1996). The trial court found Camins credible. Consistent with Camins' testimony, the trial court found that it was reasonably foreseeable "[t]hat the Property's excess land could be developed and used." Trial Ct. Op. at ¶ 48; R.R. at 199a. Further, the trial court found that Camins' "fair market value conclusions ... [were] based on the present condition of the Property, not the Property as it might in the future be developed, and the Property was viewed as a whole, and not as if it had been subdivided." *Id.*; R.R. at 354a.

However, the trial court's characterization of Camins' testimony is undermined by Camins' expert reports. Although Camins testified that his conclusions were not based upon the Property's subdivision, his expert reports, as described above, demonstrate that Camins divided the Property and valued each part separately. Even though the trial court's final assessed values do not separately assign value to the excess land, those values are based directly upon Camins' reports which did impose a hypothetical subdivision of the Property. The record evidence clearly reveals that in order for the trial court to have reached the conclusion it did relying upon the record evidence it had to subdivide the property which it is not permitted to do. The trial court as well as the Concurrence/Dissent quoting Camins' self-serving conclusions that "he did not subdivide the property" does not and cannot support the specific findings made by the trial court which clearly are based on the factual details as to how Camins' reached his decision which was through subdivision. Accordingly, this Court finds that the trial court erred and that Camins' assessment was based upon a legally impermissible hypothetical subdivision of the Property.[10]

10. Taxpayer also argues that the trial court's conclusion that there is excess land on the Property ignores numerous record facts pertaining to the land's topographical and environmental condition, assuming instead that the land is free and clear of environmental

■ Finally, Taxpayer maintains that the trial court erred when it concluded that the highest and best use of the Property is warehouse and office space despite its current use as a manufacturing facility. We disagree.

This Court has explained:

For purposes of tax assessment, real estate must be valued according to the actual value thereof. The term 'actual value' is defined as market value or fair market value, which is defined as the price, which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied. The highest and most profitable use to which land is adaptable is only one factor to consider in determining its price.

*ENF Family P'ship v. Erie Cnty. Bd. of Assessment Appeals*, 861 A.2d 438, 440 n. 4 (Pa.Cmwlth.2004) (citations and quotation marks omitted).

Taxpayer's argument appears to be solely a challenge to the trial court's factual findings. As discussed above, the trial court is the ultimate factfinder and its findings may not be disturbed so long as they are supported by substantial evidence. *Grand Prix Harrisburg, LLC.* Camins testified in great detail as to the basis for his conclusion that the highest and best use of the Property is warehouse and office space. Specifically, Camins testified:

And in analyzing the highest and best use of the land, the site itself is 229.24 gross acres with access ... from Route 30 at the lighted intersection with Eden Road, and you have the turning lanes and so on....

The site itself ... is zoned industrial.... [B]ecause of its proximity to Route 83 and being right along Route 30 and having good visibility, good frontage, and so on, does permit certainly a utilization of the site which from a legal perspective, it is zoned industrial, which ... does permit manufacturing, warehousing, distribution.

You could have truck terminals in there. You could have corporate offices, even auto dealerships there, and the zoning does permit business parks and other related entities.

. . . .

If you look at the characteristics of the site itself ... it's a big site and it's got good frontage, it's got good visibility, it's got what is called good curb appeal as compared to a lot of other industrial ... sites, and in light of all these things, the highest and best use of the site itself, if it were as a vacant site, would be for an industrial office park type use probably with some commercial development along Route 30 frontage.

[Considering the property as improved as it is now,] we have the same four tests of what is physically possible, legally permitted, financially feasible, and maximally productive.

. . . .

The buildings themselves are good buildings in the sense that you have good ceiling heights in many areas. You have good physical factors present. Functional characteristics are good. You have the ancillary service buildings.

conditions and treats that allegedly excess land "as though it were already in that hypothetical condition." *Air Prods.*, 720 A.2d at 794. Specifically, Taxpayer points to "the sloping topography of the Property, the location of restricted potential unexploded ord-

nance areas, the existence of eastern landfill together with the north end of the test tract and the Building 16 vapor degreaser, all of which are located directly in the middle of the sloping land Mr. Camins claims to be excess land...." Taxpayer's Br. at 34.

You have an electrical substation. You have utilities available and so forth.

And taking that into account and analyzing the complex in relation to its entirety, the conclusion is that the highest and best use would be probably to have the main section of the complex recognized as a kind of cluster, if you will, and the remainder reflecting in my opinion excess land, meaning that this would be land which ... could be separately utilized for development other than what one already has on the site because the site itself is quite large, very large.

....

[T]he subject property highest and best use is for warehousing, office use with any excess land suitable for development....

R.R. at 194a–95a.

The trial court, as it was permitted to do, found Camins credible, despite Taxpayer's argument that his conclusion was undercut by his inconsistent testimony. It is well-established that "where evidence is conflicting, the issue of credibility of witnesses and a resolution of the conflict is a matter solely of the trier of fact." *Commonwealth v. Lilliock*, 740 A.2d 237, 242 (Pa.Super.1999). Further, "any inconsistencies in the evidence are a matter for the trier of fact to resolve[.]" *Id.* In the instant case, the trial court as the trier of fact was entitled to weigh the testimony of both parties' experts. Here, the trial court determined that Camins' testimony was credible, and that his determination of highest and best use was reasonable. A review of the record demonstrates that the trial court's conclusion was based upon substantial evidence.

For all of the above reasons, we vacate in part the trial court's order and remand this matter to the trial court to 1) properly apply Section 9 of the Second Class A and Third Class County Assessment Law, 72 P.S. § 5350; 2) determine the impact of the environmental conditions upon the Property's fair market value based upon discernible, objective record evidence; and, 3) determine the Property's assessed value without impermissibly subdividing the Property. We affirm the trial court's highest and best use determination.

## ORDER

AND NOW, this 30th day of October, 2013, the York County Common Pleas Court's January 8, 2013 order is affirmed in part and vacated and remanded in part. The trial court's determination of the Property's assessed values is vacated and this matter is remanded to the trial court to 1) properly apply Section 9 of the Second Class A and Third Class County Assessment Law;[1] 2) determine the impact of the environmental conditions upon the Property's fair market value based upon discernible, objective record evidence; and, 3) determine the Property's assessed value without impermissibly subdividing the Property. The trial court's determination of highest and best use is affirmed.

Jurisdiction is relinquished.

CONCURRING AND DISSENTING OPINION BY President Judge PELLEGRINI.

I respectfully dissent because the majority is improperly usurping the role of the York County Common Pleas Court (trial

---

1. Second Class A and Third Class County Assessment Law, Act of June 26, 1931, P.L. 1379, 72 P.S. §§ 5342–5350k, repealed by the Act of October 27, 2010, P.L. 895 (Act 2010–93). The Second Class A and Third Class County Assessment Law was replaced by the Consolidated County Assessment Law, 53 Pa. C.S. §§ 8801–8868, effective January 1, 2011. Section 6(1)(i) of Act 2010–93.

court) as the finder of fact [1] by reweighing evidence with respect to Camins, the School Districts appraiser's 5% "stigma" devaluation factor for the Property's environmental contamination and his appraisal approach to the Property's valuation; I concur with the remainder of the majority's opinion.

The majority holds that Camins 5% "stigma" devaluation factor is nothing more than a "guess" because he testified that "stigma is not a major thing with industrial property." (Reproduced Record (R.R.) at 300a). What that statement ignores is that all experts' testimony about anything are guesses but expert guesses which transform them into opinions, and 5% is not a "major thing." Camins was merely using his best judgment as an expert to quantify the reduction in the Property's valuation as a result of the subjective intangible stigma that is attached to the Property due to its contamination. There is no allegation that Camins' opinion in this regard is based on facts outside the record, on assumptions that are contrary to the established facts, or on any other improper factors.[2] As a result, Taxpayer's argument in this regard goes to the weight and credibility of Camins' testimony which is not subject to our review on appeal. See, e.g., Smith v. Carbon County Board of Assessment Appeals, 10 A.3d 393, 399–400

(Pa.Cmwlth.2010), appeal denied, 611 Pa. 636, 23 A.3d 1058 (2011) (holding that the testimony of a taxpayer's appraisal expert was admissible even though he did not conduct a formal appraisal of comparable properties; he accessed data online rather than the assessment office's actual records; he failed to consider factors including the condominium unit's location or upgrades and maintenance of the unit; and the expert's methodology went to the weight and credibility of his testimony and not its competence).

Finally, regarding Camins' appraisal approach to valuation, the majority relies on the contents of Camins' report and not his testimony before the trial court. The trial court found that Camins' fair market value conclusions were based upon the present condition of the Property, not as it might be developed, and viewing the Property as a whole, not as if it had been subdivided. (R.R. at 340a). As a result, the trial court determined that Camins' appraisal did not amount to an impermissible hypothetical subdivision and that he appropriately considered the market value for both the primary site and the excess land in his appraisal. (Id.). Camins' testimony supports the trial court's findings and determination in this regard because he specifically testified that he did not

1. In assessment cases, the trial court must make its determination based on the evidence presented and the credibility and weight of such evidence is solely within the trial court's purview. Green v. Schuylkill County Board of Assessment Appeals, 565 Pa. 185, 195, 772 A.2d 419, 426 (2001). Thus, while the weight of the evidence is before an appellate court for review, the trial court's findings of fact are entitled to great weight and will only be reversed for clear error. Id. at 196–97, 772 A.2d at 426–27.

2. A contamination "stigma" is an appropriate factor in determining the valuation of a particular parcel of property. See, e.g., Craftmaster Manufacturing, Inc. v. Bradford County

Board of Assessment Appeals, 903 A.2d 620, 633 (Pa.Cmwlth.2006); Dealers Manufacturing, Co. v. County of Anoka, 615 N.W.2d 76, 79 (Minn.2000) ("[A] stigma factor can attach to property whether contaminants are present, are threatened, or are totally absent. Where, for example, a property has been successfully remediated leaving no contamination, or is in proximity to property that is contaminated, stigma may nonetheless be present as a heavy burden on the value of the property due to the perception of risk of liability or government imposed restrictions on the use or transferability of the property, among other concerns. . . .").

assume that the parcel was already subdivided when he did the analysis regarding the parcel, and that he looked at the Property as-is and as an entirety. (*Id.* at 197a–198a). The trial court was free to accept Camins' testimony in this regard and to reject contrary statements that may or may not appear in his report, and the majority errs in making contrary credibility and weight determinations with respect to this evidence.

Accordingly, unlike the majority, I would not require the trial court to reexamine on remand its determinations with respect to the Camins' 5% stigma devaluation factor or his appraisal approach to the Property's valuation for assessment purposes.