IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, STEVENS, JJ.**

| | |
|---|---|
| HARLEY-DAVIDSON MOTOR COMPANY | : No. 82 MAP 2014 |
| | : |
| | : Appeal from the order of the |
| | : Commonwealth Court dated October 30, |
| v. | : 2013 at No. 159 CD 2013 which |
| | : Affirmed/Vacated/Remanded the order of |
| | : the Court of Common Pleas of York |
| SPRINGETTSBURY TOWNSHIP, | : County, Civil Division, dated January 8, |
| CENTRAL YORK SCHOOL DISTRICT | : 2013 at No. 2004-SU-1832-Y08 |
| AND YORK COUNTY BOARD OF TAX | : |
| ASSESSMENT APPEALS | : |
| | : ARGUED: November 18, 2014 |
| | : |
| APPEAL OF: CENTRAL YORK SCHOOL | : |
| DISTRICT | : |

**OPINION**

**MADAME JUSTICE TODD**                    **DECIDED: September 29, 2015**

This appeal by allowance involves the proper determination of the fair market value of a commercial/industrial property for purposes of property tax assessment, including consideration of environmental contamination, remediation, and stigma, as well as the potential for future subdivision of the property. For the reasons that follow, we affirm in part, and reverse in part, the order of the Commonwealth Court and remand the matter to that court, for remand to the Court of Common Pleas of York County, for further proceedings consistent with this Opinion.

The factual and procedural background of this appeal is as follows. This matter concerns a 229.24 acre parcel of commercial/industrial property situated at 1425 Eden Road, Springettsbury Township, York, Pennsylvania, which is currently owned by

Appellee Harley-Davidson Motor Company ("Harley-Davidson"). Approximately 110 acres of the parcel contain buildings and other improvements, and the remaining 119 acres are considered "excess" land. Previously, the United States Navy, from 1941 until 1964, and, later, a private firm, American Machinery and Foundry Company ("AMF"), with whom Harley-Davidson merged in 1969, used the parcel to operate a weapons manufacturing plant and, in the course of their business, buried numerous contaminants – as well as unexploded military ordnance – in the subsurface strata. Not surprisingly, this use occasioned significant environmental damage to the property. Military contracting was phased out in the 1980s. In 1993, Harley-Davidson repurposed a portion of the site to operate a motorcycle manufacturing plant, which continues in operation today.

Subsequently, in 1995, in the course of extant environmental litigation, the United States, the United States Department of Defense, and the United States Department of the Navy (collectively, the "United States government") and Harley-Davidson executed a settlement agreement.[1] As discussed more fully below, pursuant to the 1995 settlement agreement, the parties agreed, *inter alia*, to share 100% of the costs of the parcel's remediation.[2] At present, remediation has not yet been completed, and Harley-Davidson is participating in the "One Cleanup" program of the United States

_____

[1] Pursuant to the settlement agreement, the parties resolved ongoing litigation pending in federal court regarding responsibility for remediation, and ongoing investigation and monitoring, of the property. Harley-Davidson pledged to remediate the property and the United States government agreed to pay $2.3 million to Harley-Davidson for past response costs. Further, the parties agreed to set up a "York Facility Remediation Trust Fund," and to split future remediation expenses, with the United States government paying 53% and Harley Davidson paying 47%.

[2] The parties dispute the effect of the 1995 settlement agreement, and related environmental remediation costs and obligations, with respect to the proper assessment of the fair market value of the property.

Environmental Protection Agency ("EPA"), which permits owners of contaminated land to avoid federal environmental liability by complying with state remediation law. Therefore, federal standards are satisfied if the requirements under the state program are met. As a result, and collaterally as a matter of state law, Harley-Davidson's conduct relative to the parcel is governed by the Pennsylvania Land Recycling and Environmental Remediation Standards Act, 35 P.S. §§ 6026.101 *et seq.* ("Act 2"), which enables land owners to avoid state environmental liability by satisfying certain conditions, including, *inter alia*, using or selling the property only for commercial/industrial purposes, and maintaining certain engineering controls until Act 2 remediation is complete.

In 2003, the Assessment Office of York County ("Assessment Office") notified Harley-Davidson that it intended to increase the parcel's property tax assessment. Harley-Davidson filed an appeal with the York County Board of Assessment Appeals ("Board"), which affirmed. Harley-Davidson then filed a *de novo* appeal in the trial court. Appellant Central York School District ("School District") intervened, and the parties proceeded to a three-day bench trial to determine the parcel's assessments for tax years 2004 through 2010, pursuant to the Second Class A and Third Class County Assessment Law.[3]

The case proceeded to a bench trial before Judge Stephen P. Linebaugh. At trial, both parties offered experts in support of their positions regarding valuation of the property. The experts considered the three traditional approaches to valuation, discussed below in greater detail: the cost approach, the comparable sales approach, and the income approach. As the trial court concluded, and the parties agreed, the cost

[3] The Second Class A and Third Class County Assessment Law, 72 P.S. §§ 5342-5350k, was subsequently repealed and reenacted within the Consolidated County Assessment Law, 53 Pa.C.S. § 8801-8868, effective January 1, 2011.

approach, which considered reproduction or replacement costs of the property, less depreciation and obsolescence, was not applicable to the property. The testimony before the trial court focused on the comparison approach, which compares sales of property of similar size, type, and location of the property, and the income capitalization valuation approach, which considers fair market value by dividing the subject property's annual net rental income by an investment rate of return. Jackson v. Bd. of Assessment Appeals of Cumberland Co., 950 A.2d 1081, 1084 n.1 (Pa. Cmwlth. 2008).

The School District relied largely upon the testimony of Stephen Fulton, an expert in environmental contamination, and, particularly relevant for this matter, Bernard Camins, an expert witness in real estate appraisal. Camins testified that, upon examination of the property, its "highest and best use"[4] would be for "warehousing, office use with any excess land suitable for development." N.T., 1/24/2011, at 346. Accordingly, Camins compared, *inter alia*, the prices of sales of similarly situated land to developers for similar purposes — here, a Caterpillar plant in Springettsbury Township, York County — and found that, given a developer's likely costs and profits, the main portion of the parcel (for warehousing/office use) would sell for approximately $50,000 per acre and the excess land (for development) would sell for approximately $75,000 per acre, concluding that the parcel had the following aggregate market values:

| Tax Year | Market Value |
| --- | --- |
| 2004-07 | $24,500,000 |
| 2008 | $26,500,000 |
| 2009 | $24,500,000 |
| 2010 | $18,000,000 |

---

[4] The "highest and best use" is a tool in assessing the value of property that contemplates the reasonable and probable use of property that supports the highest present value on the date of the appraisal. See Krohn v. Snyder Co., 62 A.3d 476, 477 (Pa. Cmwlth. 2013).

<u>See</u> Letter from Camins Associates to Philip H. Spare, Esq., 1/14/2011, at 4 (R.R. at 562a). In providing his valuation, Camins repeated numerous times that he had made his conclusions based on an evaluation of the property in its current state, and not as if it were already subdivided or developed.

Camins further testified that he considered the parcel's environmental contamination in arriving at his valuation. Specifically, Camins indicated that, since the 1995 agreement made the United States government and Harley-Davidson jointly responsible for remediation, and since the environmental degradation of the property itself would not preclude the type of development he contemplated, his appraisal was not changed as a result of the contamination. However, Camins noted that, regardless of whether environmental damage to the property would give rise to expense, the associated stigma reduced its market price, and, thus, he applied an across-the-board 5% reduction to his appraisal. Consequently, Camins' final determinations of market value were as follows:

| Tax Year | Market Value |
|----------|--------------|
| 2004-07  | $23,000,000  |
| 2008     | $25,000,000  |
| 2009     | $23,000,000  |
| 2010     | $17,000,000  |

<u>See</u> <u>id.</u>; N.T., 1/24/2011, at 329.

Harley-Davidson offered the expert testimony of Elliott Weinstein. Weinstein concluded that owner-occupied industrial uses were the highest and best use of the property, employed a "cost-to-cure" approach to environmental remediation, discussed below, which was not based upon the 1995 settlement agreement, and ultimately opined that the market value of the property was as follows:

| Tax Year | Market Value |
|----------|--------------|
| 2003 | $7,800,000 |
| 2004 | $7,800,000 |
| 2005 | $7,500,000 |
| 2006 | $7,300,000 |
| 2007 | $7,800,000 |
| 2008 | $8,800,000 |
| 2009 | $9,100,000 |
| 2010 | $6,600,000 |

See N.T., 1/24/2011 at 110, 149, 152-53.

The trial court rejected Weinstein's expert testimony as not credible. Specifically, the court found, *inter alia*, that his estimates of a lower fair market value of the property were without support; his comparisons to similar properties were not based on owner-occupied industrial users; he changed his opinion of the highest and best use of the property throughout his report; and his treatment of the environmental conditions on the property and valuation approaches were inconsistent.

Ultimately, the trial court found for the Board and the School District, crediting Camins' testimony, and specifically finding the highest and best use of the property was for warehouse and office use with excess land being suitable for development, and, importantly for purposes of this matter, that the fair market value conclusions of Camins were based on the present condition of the property, and not as if the property had been subdivided. However, without explanation, the trial court then adopted Camins' pre-reduction market values as the parcel's assessed values:

| Tax Year | Assessed Value |
|----------|----------------|
| 2004-07 | $24,500,000 |
| 2008 | $26,500,000 |
| 2009 | $24,500,000 |
| 2010 | $18,000,000 |

Trial Court Opinion, Findings of Fact and Conclusions of Law, 1/8/2013 at 12.

Harley-Davidson timely appealed to the Commonwealth Court, claiming, *inter alia*, that: (1) the trial court erred in relying on Camins' report because, contrary to the Commonwealth Court's decisions in Air Products and Chemicals, Inc. v. Board of Assessment Appeals of Lehigh County, 720 A.2d 790 (Pa. Cmwlth. 1998), and Craftmaster Mfg., Inc. v. Bradford County Board of Assessment Appeals, 903 A.2d 620 (Pa. Cmwlth. 2006), Camins had valued the property not in its current condition, accounting for prospects of subdivision and development, but, rather, as if it were already subdivided and developed; and (2) the trial court erred in relying on Camins' report because Camins did not properly account for the effect of the parcel's environmental contamination upon market price and, also, applied an arbitrary stigma reduction.

In a published opinion, a divided Commonwealth Court affirmed in part, and vacated and remanded in part. In re: Appeal of Harley-Davidson Motor, 80 A.3d 506 (Pa. Cmwlth. 2013). Regarding Harley-Davidson's initial claim, the Court observed that, pursuant to, *inter alia*, Air Products and Craftmaster, an appraisal must be based on the property in its current state, considering its potential for development, but that valuation of the property may not be made as if it were already subdivided and developed. The court noted that, in Craftmaster, it reviewed a trial court's acceptance of an expert's appraisal of market value wherein the expert had "viewed the Property as three separate tax parcels and assigned separate values" to each parcel, and rejected that appraisal because, *inter alia*, it found that the method evaluated the property as if it had already been subdivided and developed. In re: Harley-Davidson, 80 A.3d at 520 (quoting Craftmaster, 903 A.2d at 624). Noting that, in the instant case, Camins had likewise considered the property in piecemeal fashion, the court found the trial court's reliance on Camins' appraisal was not supported by substantial evidence.

With respect to Harley-Davidson's second claim, the Commonwealth Court observed that, notwithstanding the 1995 settlement agreement, Harley-Davidson's participation in federal and state remediation programs required, *inter alia*, that it not sell the parcel for any non-commercial, non-industrial purposes, and that it require any purchaser to continue maintenance of engineering controls to monitor environmental conditions at the site. Reasoning that these restrictions would certainly affect the parcel's market value, the Commonwealth Court rejected Camins' and the trial court's conclusions to the contrary as unsupported by substantial evidence. Moreover, the Commonwealth Court agreed that Camins' and the trial court's application of a 5% stigma reduction was essentially arbitrary, in that there was no evidence of record detailing how Camins' arrived at that number, and, thus, found the same was likewise unsupported by substantial evidence. Accordingly, the court vacated the trial court's order and remanded to the trial court with instructions to properly calculate the assessed value, with due consideration of Harley-Davidson's environmental obligations, using a discernable evaluation of environmental stigma, and without impermissibly evaluating the property as subdivided.

Then-Judge, now-President Judge, Pellegrini filed a concurring and dissenting opinion. President Judge Pellegrini opined that the majority had usurped the factfinder's function in rejecting Camins' professional judgment with respect to the stigma's effect on market price, which he reasoned was itself substantial evidence, as an expert "guess." In re: Harley-Davidson, 80 A.3d at 523 (Pellegrini, P.J., concurring and dissenting). The dissent noted that there was no allegation that Camins' opinion in this regard was based upon facts outside of the record, on assumptions contrary to established fact, or on other impermissible factors. Thus, according to the dissent, the matter of environmental stigma went to the weight and credibility of Camins' testimony,

which was not subject to appellate review. The dissent also found that the majority erred in disregarding Camins' testimony at trial that he evaluated the parcel as it stood, with *potential* for subdivision, rather than as if it were already subdivided.

The School District filed a petition for allowance of appeal with this Court, which we granted as to the following two issues:

> (1) Whether the trial court properly considered reasonably foreseeable hypothetical ways in which the property could be used by potential buyers to determine what a willing buyer would pay for the property consistent with the holdings in <u>Craftmaster Mfg., Inc. v. Bradford County Board of Assessment Appeals</u>, 903 A.2d 620 (Pa. Cmwlth. 2006) and <u>Air Products and Chemicals, Inc. v. Board of Assessment Appeals of Lehigh County</u>, 720 A.2d 790 (Pa. Cmwlth. 1998)?
>
> (2) Whether the trial court followed Commonwealth Court precedent and properly considered the impact of environmental conditions by reviewing the settlement agreement, interpreting Pennsylvania's Land Recycling and Remediation Standards Act (Act 2), accepting the opinion of an expert appraiser, and applying a five percent reduction in value for stigma?

<u>Harley-Davidson Motor Co. v. Springettsbury Twp.</u>, 97 A.3d 729 (Pa. 2014) (order). In reviewing a tax appeal, the appellate court must determine whether the trial court abused its discretion, committed an error of law, or rendered a decision unsupported by the evidence. <u>Safe Harbor Water Power Corp. v. Fajt</u>, 876 A.2d 954, 966 n.12 (Pa. 2005); <u>Appeal of Marple Springfield Ctr., Inc.</u>, 607 A.2d 708, 709-10 (Pa. 1992).

In its first issue raised on appeal, the School District initially offers that the starting point for an appraisal is to determine the "highest and best use" of the property. The School District points out that the lower tribunals determined, consistent with Camins' testimony, that the highest and best use of the property is not as a single user

manufacturing facility, but as a warehouse and office space with excess land suitable for development. Moreover, the School District argues that the methodology that Camins used to determine fair market value of the property is consistent with a long line of Pennsylvania decisions. Specifically, the School District submits that the Commonwealth Court in Air Products and Craftmaster explained that hypothetical ways in which property could be used by potential buyers, including subdivision of the property, should be considered in determining what a willing buyer will pay for the property in its current condition, but that the property should not be valued as though it were already in that hypothetical condition. Thus, consistent with Air Products and Craftmaster, the School District maintains Camins did just that: determined the parcel's value by considering what a developer would pay for it, which necessarily entailed a calculation of what a developer would spend and earn in developing the property, and the Commonwealth Court erred in concluding that Camins had, contrary to his testimony, determined the parcel's value as if it were already subdivided. Further, the School District contends, consistent with President Judge Pellegrini's dissent, that, since Camins repeatedly testified that he had evaluated the property in this regard, and not as if it were already subdivided, the Commonwealth Court usurped the trial court's role and erred in impeaching Camins' testimony with the substance of his report. The School District asserts that Harley-Davidson's position — that the reasonably foreseeable prospect of the property's excess land being developed in the future is not a permissible factor in valuation — is erroneous, and contradicts Air Products and Craftmaster, as well as well-established practice among appraisers. The School District stresses that the trial court found that there was excess land on the property, and that it was reasonably foreseeable that the excess land could be developed.

Further, the School District maintains that the substantial evidence supports the conclusion that the property was not valued as if already subdivided. Specifically, the School District offers Camins' negative response to the question of whether he assumed the property was already subdivided, his statement that he looked at the property in its entirety, and his statement that that subdivision was not assumed for the highest and best use, as the property did not have to necessarily be subdivided. Finally, the School District points out that Camins provided one final value conclusion for each year in question, and did not assign separate taxable values based upon separate properties. The School District emphasizes Camins' testimony regarding hypothetical uses, i.e., how the property *could* be subdivided, how the building *could* be sold, and how the excess land has *potential* for subdivision. Camins' testimony, according to the School District, is consistent with Air Products and Craftmaster's holdings that hypothetical ways in which the property could be used for potential buyers should be considered in determining what a willing buyer would pay for the property. Related thereto, the School District submits that the substantial evidence of record also supports that Camins did not value the property as if it were already adapted for its highest and best use as a warehouse and office space, as deductions for demolition and renovations to the property, and other costs, including leasing of buildings and the developers' profit, which would be required to realize the property's highest and best use were taken into account. Thus, rather than valuing the property already in the hypothetical condition, the School District contends that Camins valued the property considering the costs a typical developer would incur to realize the highest and best use of the property.

The School District also points to eminent domain cases as an analogy to the proper approach in determining fair market value, as such cases involve highest and

best use determinations, as well as the use of hypothetical subdivision to show the best value of property. Stressing the appropriate standard of review, the School District urges that the trial court did not abuse its discretion, committed no error of law, and based its decision on the substantial evidence of record, and, thus, that the Commonwealth Court's order vacating the trial court's determination should be reversed.

Harley-Davidson responds that the School District's appraiser, Camins, identified portions of the property as excess land suitable for development and improperly considered a subdivision of the excess property in arriving at his assessment. Harley-Davidson argues that the Commonwealth Court's decisions in Craftmaster and Air Products were properly relied upon by the court below as prohibiting a subdivision approach to valuation. Specifically, Harley-Davison avers that the circumstances in this appeal are similar to that in Craftmaster, which relied in part upon its prior decision in Air Products. Harley-Davidson offers that, in Craftmaster, the court found an expert's valuation based upon a hypothetical subdivided property — including valuation of residential structures in the area, valuation of former residential structures that were being used by Craftmaster in its business operations, and identifying excess land which was valued separately on the assumption it could be sold to smaller businesses — did not represent a reasonably foreseeable "prospect" for the property which existed at the time of the assessment. Harley-Davidson claims that, like Camins, the appraiser in Craftmaster engaged in the legally inappropriate hypothetical subdivision of the property in arriving at his opinion as to a highest and best use of the property. Moreover, Harley-Davidson submits that the Commonwealth Court's prior decision in Air Products is entirely consistent with its decision in the matter *sub judice*, as, while the rationale for the Air Products decision involved employment of a value-in-use analysis, not whether

an improper subdivision was conducted, the court was faced with a similar assessment situation in which the court noted a distinction between reasonably foreseeable prospects for the property which exist at the time of the assessment — that is, probable use, which may be considered in determining property fair market value — and impermissible valuation as though the property were already in that hypothetical condition.

Harley-Davidson rejects the School District's claim that Camins did not value the property as if it were already subdivided, but that he only addressed the highest and best use of the property, by offering that: (1) Camins designated three areas within the property and valued each part of the property separately suggesting an actual subdivision; (2) Camins used comparable land sales in York County which lacked excess land or surplus land of a manufacturing facility which were sold off in bulk; and (3) Camins made various references in his testimony suggesting or noting the potential for the subdivision of the property. This valuation, as determined by the Commonwealth Court, and as Harley-Davidson presses here, constituted a subdivision valuation prohibited by Craftmaster.

Finally, Harley-Davidson dismisses the School District's analogy to eminent domain valuation, noting that fair market value is more broadly defined under the Eminent Domain Code as the price agreed to by a willing and informed seller and buyer, and contemplates factors such as the present use of the property and its value for that use, the highest and best reasonably available use of the property and its value for that use, the machinery, equipment, and fixtures forming part of the real estate, as well as other factors.

The General Assembly and this Court have set forth the foundational principles for the determination of the fair market value of property for tax assessment purposes.

A property is to be assessed at its actual value. 53 Pa.C.S. § 8842 (previously 72 P.S. § 5020-402(a)).[5] Actual value means a parcel's fair market value, which is "the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied." F & M Shaeffer Brewing Co. v. Lehigh Cty. Bd. of Assessment Appeals, 610 A.2d 1, 3 (Pa. 1992) (plurality) (quoting Buhl Foundation v. Bd. of Property Assessment, 180 A.2d 900, 902 (Pa. 1962)). The "actual or fair market value, while not easily ascertained, is fixed by the opinions of competent witnesses as to what the property is worth on the market at a fair sale." Id. In this regard, a parcel's market value is distinct from its value as it is currently being used; and while this Court has not definitively so held, the Commonwealth Court has reasoned that a property's use and its resulting value-in-use (value unique to a particular owner) is not to be considered in assessing the fair market value of property for tax assessment purposes.[6]

---

[5] See supra note 2.

[6] In our nonprecedential plurality decision in F & M Shaeffer Brewing Co., we noted that a property's current use value should not be considered for assessment purposes. Id. Subsequent Commonwealth Court decisions, have consistently embraced the position that "value-in-use" is not to be considered in assessing the fair market value of property for tax assessment purposes. See, e.g., BET Lehigh Real Estate, LLC v. Schuylkill Co. Bd. of Assessment Appeals, 67 A.3d 845, 860 (Pa. Cmwlth. 2013); 1198 Butler Street Assoc. v. Bd. of Assessment Appeals, 946 A.2d 1131, 1138 (Pa. Cmwlth. 2008). However, other states and scholarship have suggested that, if no market value exists, viewing contaminated properties as special purpose properties and considering value-in-use or value-in-exchange when assessing the value of a property may be proper. See Bonnie H. Keen, *Tax Assessment of Contaminated Property: Tax Breaks for Polluters?*, 19 B. C. Envtl. Aff. L. Rev. 885, 906 (Summer 1992). Similarly, certain Commonwealth Court decisions have eschewed a value-in-use approach, but have employed the phrase "continued use" — as distinguished from value-in-use — to mean the value of a property to an arms-length buyer where such a purchaser would likely continue the parcel's current use. See, e.g., Craftmaster Mfg., 903 A.2d at 633-35; McGraw-Edison Co. v. Wash. Cnty. Bd. of Assessment Appeals, 573 A.2d 248, 251 (Pa. Cmwlth. 1990). In the instant case, however, the parties do not present advocacy
(continued…)

In assessing actual value, the legislature has required three approaches (1) cost reproduction, or replacement, as applicable, less depreciation and all forms of obsolescence; (2) comparable sales; and (3) income approach, and all three approaches to valuation must be considered in conjunction with one another. Id; 53 Pa.C.S. § 8842(b).

In Air Products, supra, the Commonwealth Court applied the foregoing principles to conclude that, although a property's market value must incorporate its potential for subdivision and development, an appraiser must value the property as it stands, and not assume that potential has already been realized:

> In other words, hypothetical ways in which the property could be used by potential buyers should be considered in determining what a willing buyer would pay for the property. That is not to say, however, that the property should be valued as though it were already in that hypothetical condition. For instance, a large farm may have greater potential value if the land were subdivided into one acre lots for single family homes, but while that *potential* must be considered, the property may not be taxed as though it were currently subdivided and developed.

Air Products, 720 A.2d at 793-94. Therein, the court referenced F & M Schaeffer's fair market value analysis, and its distinction between "value-in-exchange" versus "value-in-use," and explained that reasonably foreseeable prospects for a property which exist at the time of valuation may be considered in analyzing a property's fair market value (value-in-exchange). The Commonwealth Court found that a parcel's fair market value

---

(…continued)
regarding whether and how the present use of a property should be considered in a highest and best use assessment, and, thus, we leave any definitive statement by our Court regarding consideration of the value of the property in its present state for future controversies in which the issue is raised.

incorporates its *potential* for sale for future uses, but this potential is distinct from the property's actual value to a specific user (value-in-use), which, as noted above, the court considered not a reflection of fair market value and not relevant in tax assessment determinations.

Eighteen years later, in Craftmaster, the Commonwealth Court similarly rejected an analysis that embraced a comparable sale analysis and assigned a separate value to various structures, hypothetically, as though they were already in the subdivided condition. Craftmaster, 903 A.2d at 631-32. In so doing, the court opined that hypothetical, but reasonably foreseeable, uses of the property for valuation are permissible in the valuation calculus, but subject to limitations:

> This Court does not agree that [the appraiser's] opinion represented a reasonably foreseeable prospect for the Property which existed at the time of his assessment. Although he couched his opinion in terms of the probable market value, there was no evidence that Craftmaster had any present (or future) intention of selling those structures as residences. In fact, the evidence indicated that the reason that the owners sold their homes in the first place was because of their undesirable location next to the plant. There was also no indication that the Property, which was located in an industrial zoning district, would or could be subdivided and rezoned residential. [The appraiser's] opinion was purely speculative and the precise type of valuation testimony proscribed by [*inter alia*, Air Products]. [The appraiser] should have based his value on the Property as is, rather than its value when configured into its hypothetical highest and best use.

Id. at 632 (internal citations and quotations omitted; footnote omitted). The Commonwealth Court's approach in Air Products and Craftmaster is in accord with this Court's teachings in F & M Schaeffer: that ways in which a property hypothetically could be used by potential buyers are properly considered by an expert in evaluating

what a willing buyer would pay for a property; however, the subject property should not be valued as though it were already in that hypothetical condition. The parties have offered no reason, and we discern none, to depart from this standard.

As noted supra, the Commonwealth Court determined that Camins valued the subject property as if it had already been subdivided, and developed, in contravention of Air Products and Craftmaster, the view proffered by Harley-Davidson. Review of the entire record, however, including Camins' credited testimony and the trial court's opinion, demonstrates that this was not the case. As emphasized by President Judge Pellegrini in his concurring and dissenting opinion, the record establishes that Camins' purpose in referring to a hypothetical subdivision was merely to show the use to which the land was best adapted and the property's highest and best use. Specifically, as noted by the School District, Camins determined the highest and best use of the property was as a warehouse and office space, with excess land suitable for development, and, in doing so, made clear that he did not assume the property was currently subdivided. See, e.g., N.T. 1/25/2011, at 347-48. Indeed, Camins testified that he considered what amount a developer would pay — in the current market and in the property's current condition — to obtain and develop the parcel, which included a potential developer's risks, and demolition and renovation costs. Additionally, Camins' final opinion contains one value determination for each year, and not the assignment of separate taxable values for hypothetical parcels.

Pursuant to F & M Schaeffer, Air Products, and Craftmaster, such an approach was not only appropriate, but necessary: a parcel's fair market value is the amount buyers will pay for it, which depends, at least in the realm of commercial/industrial property, on the amount buyers must put into improving the parcel, and what they can expect to receive from such purchase. Indeed, akin to the farm analogy used by the

Commonwealth Court in Air Products, Camins considered the property's *potential* for future subdivision, but did not value the property *as if already* subdivided and developed.

Further, while both parties cite Camins' testimony regarding the hypothetical ways in which the property could be used by potential buyers, "Complete Appraisal Self-Contained Report" ("Appraisal"), 7/26/2006, at 49, 50, 53, and Exhibit A-4, we are persuaded, as was the trial court, that Camins' consideration of the hypothetical ways in which the property could be used to determine the highest and best use was appropriate. Specifically, Camins testified in this regard: "[t]he large size of the site suggests subdivision of the land *could* occur;" "[t]he buildings *could* be sold in bulk or subdivided and sold to various users;" due to a "significant amount of excess land, east and south of the main buildings that have the *potential* for subdivision;" and area "north and east of [the plant] *could* be subdivided into smaller parcels, which would be suitable for warehouse, and distribution type uses." Id. at 49-50 (emphasis added). These statements demonstrate that Camins determined the highest and best use of the property by considering hypothetical ways in which the property could be used by potential buyers, and not by valuing the property as if it were already subdivided.

Thus, we are constrained to hold that, under these facts, the Commonwealth Court misapplied its prior decisions in Air Products and Craftmaster, essentially forbidding virtually any reference to a parcel's hypothetical future uses, including its potential subdivision, even where such reference is necessary to determine market value.[7]

---

[7] With respect to the dissent, in a tax assessment appeal, the findings of the trial court have "great force and will not be set aside by this Court unless clear error is made to appear." Thomas Wynne, Inc. v. Bd. for the Assessment and Revision of Taxes of Montgomery Co., 253 A.2d 632, 635 (Pa. 1969). Further, a reviewing court is to affirm (continued…)

the court of common pleas unless, *inter alia*, its decision is not supported by the substantial evidence of record. Westinghouse Elec. Corp. v. Bd. of Property Assessment, 758 A.2d 1178, 1187 (Pa. 2000). While the dissent suggests that the substantial evidence does not support the trial court's determination that the property was not viewed as if it had been subdivided, and would remand for additional fact-finding and consideration, there is ample evidence in the record, both in Camins' Appraisal and his testimony, to substantially support the trial court's conclusions.

Specifically, as noted above, Camins' Appraisal is replete with explanation as to valuation based upon permissible hypothetical subdivision. The Appraisal begins with "Consideration has been given to the uses for which the property *could* be employed, location, condition, size, zoning, functional utility, sales of comparable properties, pertinent data, and applicable valuation analysis." Introduction to Appraisal, 7/26/2006, at 2. Camins properly set forth the definition of "market value," noting it "tak[es] into consideration all uses to which the property is adapted and might in reason be applied." Appraisal, 7/26/2006, at 2. As set forth above, the Appraisal goes on to list numerous hypothetical possibilities for use, and the "potential for subdivision." Id. at 49-50. Importantly, Camins recognized the costs for conversion, demolition and renovation of the buildings, id. at 51-52, and, specifically, the cost of demolition of certain buildings and space renovation, employing the services of Claflen and Associates to identify such components and costs, which were deducted from the assessment calculations. Id. at 95-100. While valuing certain portions of the property separately, hypothetical improvements were considered in the final value estimate. See, e.g., id. at 101 ("We have valued the excess land separately by means of the sales comparison approach, attributing a higher unit rate for the frontage land because its development *potential* would include some commercial uses." (emphasis added)). Camins' final opinion contains one value determination for each year, and not the assignment of separate taxable values for hypothetical parcels.

Camins' testimony at trial is entirely consistent with this view. When asked if he performed his analysis for the property assuming the property was already subdivided, Camins responded that he did not. See N.T., 7/24/2011, at 347. Camins' explanation did not suggest he had already subdivided the property in his assessment, but merely that the property did not *necessarily* have to be subdivided, as an investor *could* buy the entirety and just utilize and develop portions of the property in the future. Id. at 347-48. With respect to the excess lands, Camins was likewise clear that he did not consider the property to already be in a subdivided state, explaining that it *could* be developed aside from the main section of property. Id. at 353. When specifically asked if he assumed the property was already subdivided, Camins again indicated that he did not, and that he looked at the land in a current as-is situation and as an entirety. Id. at 354. Thus, employing deferential review, there is a solid basis on which to conclude that the trial court's determination was supported by the substantial evidence of record.

Turning to the second issue on which we granted allocatur — consideration of the impact of environmental contamination, remediation, and stigma on valuation — the Commonwealth Court panel concluded that the trial court erred, first, in relying on Camins' testimony, as the School District's expert failed to consider the impact of environmental damage on the property's value and alienability; and, second, as discussed below, in accepting a 5% environmental stigma devaluation. We address each of these aspects of the issue in turn.

The School District offers that fair market value determination becomes more complex when the property presents environmental issues, and asserts that Pennsylvania law, while requiring that environmental contamination be considered as part of the determination of fair market value, mandates no specific approach for valuation of contaminated property. It argues that the trial court's findings were based upon the substantial evidence of record, including Camins' fair market value determination. According to the School District, the trial court properly considered a number of factors with respect to environmental degradation, including a settlement agreement under which 100% of the environmental remediation costs were to be paid by the United States government or Harley-Davidson; the fact a remediation fund has been established; and the fact that, under the Pennsylvania Department of Environmental Protection's model buyer-seller agreement under Pennsylvania's Act 2 Program — used to facilitate the purchase of property while remediation of property contamination is ongoing — a buyer may purchase contaminated property and obtain protection from potential environmental liability. Thus, the School District maintains that the Commonwealth Court erred in concluding that the trial court erroneously credited Camins' testimony on the ground that his opinion failed to adequately account for

environmental degradation, and embraced a valuation of the associated stigma that was based on an uninformed guess.

Related thereto, the School District further rejects Harley Davidson's suggested cost-to-cure approach which, the School District avers, is inapt, as, again, any prospective purchaser would not be responsible for the cost of environmental remediation. While possibly appropriate where there are no binding and enforceable agreements for remediation in place, the School District claims that the cost-to-cure approach is divorced from the unique reality of the property *sub judice*.

In response, Harley-Davidson disputes the School District's claim that the settlement agreement and the model buyer-seller agreement insulate the buyer from responsibility for the environmental degradation of the property, and, thus, that only environmental stigma is at issue. According to Harley-Davidson, the agreement does not limit existing or future claims of any environmental regulator; the parties reserve the right to seek redress from those not a party to the agreement; any expenditure is subject to the availability of appropriated funds; the agreement is binding upon Harley-Davidson and its successors and assigns; and there is no provision for what would occur if Harley-Davidson went out of business or filed for bankruptcy, which might lead to a buyer of the property being responsible for environmental remediation. Similarly, Harley-Davidson challenges the School District's reliance on the model buyer-seller agreement as releasing any prospective purchaser from environmental liability, noting that such an agreement in some circumstances provides protection to a property buyer, but that there is no evidence the site will meet all of the program's criteria. Further, Harley-Davidson offers that a buyer would be responsible for maintaining engineering controls on the property and, if there was damage to a contaminated area, the buyer would be responsible for repair and remediation. For these reasons, Harley-Davidson

favors a cost-to-cure valuation approach, which includes consideration of all costs directly related to the site cleanup. According to Harley-Davidson, this approach is the same approach advocated by the School District's environmental consultant, Stephen Fulton.

As noted above, a property tax assessment must be predicated on fair market value, and, thus, must include *all* relevant factors having a bearing on that value. F & M Schaeffer, supra. Furthermore, and unremarkably, "[e]nvironmental contamination is relevant to determining the fair market value of real estate for tax purposes." B.P. Oil Co., Inc. v. Bd. of Assessment and Appeals of Jefferson Cnty., 633 A.2d 1241, 1243 (Pa. Cmwlth. 1993). The Commonwealth Court, in B.P. Oil, Co., suggested a cost-to-cure approach to considering the effect of environmental contamination on property value, explaining: "[u]nder the cost approach, the fair market value of the property is calculated by subtracting the cost to cure the contamination from the value the property would have if it were not contaminated." Id.

Preliminarily, we note that our Court has not spoken to the question of whether a cost-to-cure approach to valuation should be embraced in this Commonwealth. We reserve the answer to that question for another day, however, due to the unique status of the environmental contamination regarding the subject property and the inapplicability of a cost-to-cure approach in these circumstances.

As noted above, the property is subject to an undisputed settlement agreement between Harley-Davidson and the United States government, pursuant to which all environmental remediation costs will be fully paid by those two parties. Thus, with 100% of the environmental contamination remediation costs covered, any purchaser of the property has a certain degree of comfort that it will not be exposed to environmental remediation costs. Yet, as noted by Harley-Davidson, there is at least the possibility,

however remote, of the imposition of some remediation liability upon a prospective buyer.[8] Similarly, while the model buyer-seller agreement would release a purchaser from liability, certain restrictions and responsibilities are placed upon a purchaser even under such agreement, including restricting the use of the property for commercial or industrial purposes, an ongoing obligation to maintain engineering controls, and a prohibition against disturbing subsurface areas.

As all relevant factors having a bearing on the value of a property, including environmental contamination, must be considered in a fair market value determination, we hold that the potential impact of a settlement agreement regarding environmental remediation and ongoing limitations and maintenance as a by-product thereof, through a buyer-seller agreement, are relevant factors that must be taken into account. Accord F&M Shaeffer; B.P. Oil Co. Thus, we find that the Commonwealth Court properly remanded the matter to the trial court to determine the effect of possible remediation liability and environmental restrictions and maintenance responsibilities upon a potential purchaser of the property upon its fair market value.

Finally, with respect to the Commonwealth Court's rejection of Camins' across-the-board 5% environmental stigma devaluation, the School District maintains that the application of a 5% stigma factor is a sound approach, consistent with the law and unique circumstances of this property. According to the School District, in Craftmaster, the Commonwealth Court specifically offered the possibility of "negative stigma" impacting the valuation of contaminated property, 903 A.2d at 633, and other states

---

[8] Harley-Davidson raises the specter of the agreement binding Harley-Davidson's successors and assigns, the parties to the agreement reserving the right to pursue anyone not a party to the agreement, and the lack of a provision for what occurs if Harley-Davidson files for bankruptcy or goes out of business. Harley-Davidson Brief, at 23-24.

have recognized a stigma deduction even though the prospective buyer would not be responsible for cleanup costs. The School District proffers that Camins based his conclusion on his expertise and 40 years of experience in appraisal work, and the School District asserts the Commonwealth Court usurped the role of the trial court by ignoring the trial court's findings of fact and credibility determination on this issue. As support for its claim, the School District references President Judge Pellegrini's conclusion, in his concurring and dissenting opinion, that "Camins was merely using his best judgment as an expert to quantify the reduction in the [p]roperty's valuation as a result of the subjective intangible stigma that is attached to the [p]roperty due to its contamination." In re: Harley-Davidson Motor Co., 80 A.3d at 524 (Pellegrini, P.J., concurring and dissenting). According to the School District, and as suggested by President Judge Pellegrini, Harley-Davidson is in actuality challenging the weight and credibility of Camins' testimony, a matter outside of the scope of the Commonwealth Court's review on appeal.

Harley-Davidson counters that the School District's appraiser "guessed" at the impact of the environmental contamination on the value of the property. Specifically, Harley-Davidson notes that our courts have not approved a 5% stigma factor, and that the trial court improperly accepted such devaluation factor even though the appraiser admitted there was no support for such estimation of stigma. Harley-Davidson offers that, when asked how he could place a value on a stigma deduction, the School District's expert responded, "You don't." N.T. 2/1/2011 at 59. Harley-Davidson further highlights Camins' explanation that stigma was really only a rough perception and that "[a]s a matter of fact, there [is] almost no data available dealing with stigma." Id. at 60. Related thereto, Harley-Davidson argues that Camins' testimony is contrary to

Pennsylvania Rule of Evidence 705, which requires support for the facts or data upon which an expert opinion or inference is based.

Harley-Davidson further challenges the School District's support for a 5% environmental stigma devaluation, based on Camins' testimony that his estimate relied upon the environmental report of the School District's environmental consultant, Stephen Fulton. Harley-Davidson offers that Fulton included in his 2008 report a statement that, based on standard industry practice, the final property valuation should be based on the unencumbered value of the property, *less the present value of the estimated environmental liabilities*, which, according to Harley-Davidson, does not include environmental stigma. Indeed, Harley-Davidson, citing New Jersey intermediate court decisions, suggests that the value of contaminated property should not be diminished by any stigma value, as quantifying the effects of environmental stigma is a daunting task, and Harley Davidson submits that, of the three approaches to valuation of contamination that have emerged, none of them include a stigma component. Specifically, Harley-Davidson offers that, at one extreme, local taxing authorities have argued that they should be able to ignore the effect of contamination on property value, and, on the other extreme, taxpayers who own contaminated property have argued that tax assessors should deduct cleanup costs from the market value of the property. In what it refers to as the "Oregon Rule," based upon an approach employed by the Oregon Department of Revenue, Harley-Davidson submits that the better approach is to recognize some effect that environmental contamination has on property values — in essence, a cost-to-cure approach — as a bright-line rule that includes all costs related to the site cleanup, and a discounted present value of those costs. Harley-Davidson's Brief at 19-20 (citing 19 *B.C. Envtl. Aff. L. Rev.* 885, 901-02, 919-20 (Summer 1992)).

Consistent with the broad scope of factors that may be considered in assessing a property's value, including environmental contamination, we find that environmental stigma, although an inherently imprecise concept, may be relevant to determining fair market value of real estate for tax purposes. See Craftmaster, 903 A.2d at 633 (referring to possibility of "negative stigma" impacting valuation of contaminated property); see also Dealers Mfg., Co. v. Cnty. of Anoka, 615 N.W.2d 76, 79 (Minn. 2000) (finding an environmental stigma is a "factor [which] may be associated with a property, whether contaminants are present, are threatened, or are totally absent."). That said, "[a]n expert cannot base his [or her] opinion upon facts which are not warranted by the record. No matter how skilled or experienced the witness may be, he will not be permitted to guess or to state a judgment based on mere conjecture." Collins v. Hand, 246 A.2d 398, 404 (Pa. 1968). Thus, while consideration of an environmental stigma may be examined when determining fair market value, expert testimony of such stigma may not be offered without any foundation.

While a close call, we conclude that, considering the inherently imprecise nature of environmental stigma, Camins' 5% devaluation in the instant case was not based upon pure conjecture. Rather, Camins' testimony suggests that it is standard practice in the appraisal community to apply a 5% reduction in the context of commercial/industrial property (and a higher reduction for residential property):

> What stigma is really -- is really kind of a very rough perception that some people have. Say, well if I buy a site that didn't have any problems in the past, even if it's not going to cost me any money compared to a site that has had them, even though -- or a site that hasn't had them, I'll try to negotiate and pay less and that 5 percent adjustment was an adjustment made to reflect that intangible perception from a market perspective.

N.T., 2/1/2011 at 59-60. Camins' testimony reflected his appraisal experience and professional judgment, which a court is entitled to accept. See McMahon v. Young, 276 A.2d 534, 535 (Pa. 1971) (opining, that if credited, fact-finder may find, as fact, what the expert gave as an opinion). While an expert's opinion may not be based upon pure conjecture, we conclude that an appraisal expert's best efforts to quantify a reduction in property valuation as a result of a subjective and intangible stigma is permissible. As Camins' opinion regarding the environmental stigma associated with the property was not based upon improper factors, erroneous assumptions, or facts outside of the record, the trial court's crediting of this testimony was proper, and the Commonwealth Court's rejection of this expert testimony as unsupported was in error.

In conclusion, we reiterate: (1) hypothetical ways in which a property could be used by potential buyers are properly considered by an expert in evaluating what a willing buyer would pay for a property; however, the Commonwealth Court erred in concluding that the School District's expert valued the subject property as already subdivided, and, thus, its determination in this regard is reversed; (2) the potential effect of agreements concerning possible environmental remediation liability and ongoing environmental restrictions and maintenance is a relevant factor that must be taken into account when determining the fair market value of property, and, here, the Commonwealth Court properly concluded that these agreements were not accounted for by the trial court; thus, we affirm the Commonwealth Court's remand in this regard; and (3) environmental stigma may be relevant to determining fair market value of real estate for tax purposes in appropriate circumstances, and, presently, the trial court properly relied upon the School District's expert's opinion regarding a 5% environmental stigma devaluation for the property; thus, we reverse the Commonwealth Court's rejection of the trial court's reliance upon such stigma in its valuation of the property.

Accordingly, the decision of the Commonwealth Court is affirmed in part and reversed in part, and the matter is remanded to the Commonwealth Court for remand to the Court of Common Pleas of York County for proceedings consistent with our Opinion.[9]

Jurisdiction relinquished.

Former Chief Justice Castille did not participate in the decision of this case.

Messrs. Justice Baer and Stevens join the opinion.

Mr. Chief Justice Saylor files a concurring opinion in which Mr. Justice Eakin joins.

---

[9] Before the Commonwealth Court, Harley-Davidson challenged another aspect of the trial court's valuation of the property. The primary issue before the trial court was a determination of the *market value* of the property for the relevant years. Once the court arrived at the market value of the property for these time periods, the court was required by law to apply a common level ratio (the ratio of assessed value to current market value) for each year to arrive at the *assessed value* for the property for each year in question pursuant to 72 P.S. § 5350 (now 53 Pa.C.S. § 8854). The trial court did not apply the common level ratio to the fair market value, but rather equated the market value and the assessed value of the property. The Commonwealth Court explained that, pursuant to 72 P.S. § 5350, a court determining a parcel's assessed value must demonstrate on the record that it has determined the parcel's market value and, then, multiply that value by the applicable common level ratio to arrive at its assessed value. In the instant case, the Commonwealth Court observed that the trial court did not demonstrate its calculation on the record and, in any event, appeared to simply adopt Camins' pre-reduction values as the parcel's market value; thus, the Commonwealth Court agreed with Harley-Davidson that the trial court had erred in its calculation. Before us, the parties discuss and appear to be in agreement, as the Commonwealth Court found, that the trial court determined fair market value but failed to apply the appropriate common level ratio for each year of the tax appeal as required. As we did not grant allocatur with respect to this issue, we leave undisturbed the Commonwealth Court's remand to the trial court to properly apply the correct ratio.