# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Erie-Western Pennsylvania Port Authority and Commodore Perry Yacht Club | : | |
| | : | |
| v. | : | No. 960 C.D. 2018 |
| | : | |
| Erie County Board of Assessment Appeals and The School District of the City of Erie | : | |
| | : | |
| Appeal of: The School District of the City of Erie | : | |
| | : | |
| Erie-Western Pennsylvania Port Authority and Commodore Perry Yacht Club | : | |
| | : | |
| v. | : | No. 961 C.D. 2018 |
| | : | |
| Erie County Board of Assessment Appeals and The School District of the City of Erie | : | |
| | : | |
| Appeal of: Erie County Board of Assessment Appeals | : | |
| | : | |
| Erie-Western Pennsylvania Port Authority and Commodore Perry Yacht Club | : | |
| | : | |
| v. | : | No. 1027 C.D. 2018 |
| | : | Argued: May 6, 2019 |
| Erie County Board of Assessment Appeals, School District of the City of Erie | : | |
| | : | |
| Appeal of: Commodore Perry Yacht Club | : | |

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
               HONORABLE RENÉE COHN JUBELIRER, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION
BY PRESIDENT JUDGE LEAVITT                  FILED: July 12, 2019

The City of Erie School District (School District), Erie County Board of Assessment Appeals (Board), and Commodore Perry Yacht Club (Yacht Club) cross-appeal the June 12, 2018, order of the Court of Common Pleas of Erie County (trial court), which determined the fair market value of a private marina for purposes of its real estate tax assessment for the years 2013 through 2017. For the following reasons, we affirm the trial court.

## Background

The subject property, located at 664 West Bayfront Highway in the City of Erie, is owned by the Erie-Western Pennsylvania Port Authority (Port Authority) and has been leased to Yacht Club, a non-profit corporation, since 1976. The property consists of three acres of dry land and 13 acres of water lots, numbered from 181 to 198. The present lease, which extends through 2025, obligates Yacht Club to pay all real estate taxes.

Yacht Club constructed a marina on the property, which uses a floating dock system to provide boat slips to its members. The floating docks, constructed in 2009, replaced a fixed steel dock system. Joint Stipulation of Facts, ¶¶4, 7; Reproduced Record (R.R.) at 37a-38a.

Yacht Club has made improvements to the property. They include: breakwalls to define the borders of the water lots, a two-story clubhouse, three picnic pavilions, a workshop, an equipment building, a restroom building, an in-ground swimming pool, a gravel parking lot, concrete walkways and perimeter chain-link fencing. The lease, as modified in 1997, provides, *inter alia*, that "all buildings,

improvements, fixtures, machinery, and equipment of whatsoever nature at any time constructed, placed or maintained upon any part of the leased premises shall be and remain the property of the [Yacht Club], or its sublessees, as their interests may appear," and Yacht Club may remove them when the lease term ends. Certified Record (C.R.), Item 6, Exhibit 1, at 7.

Yacht Club pays $3,220 per year to the Port Authority on March 1 of each year. In addition, it pays a fixed rent for the boat slips that is calculated in five-year increments, with a $10 increase every five years on each boat slip. From 2011 through 2015, the annual rent to the Port Authority was $80 per boat slip. From 2016 through 2020, the annual rent is $90 per boat slip.

In turn, Yacht Club charges its members a fee based on the lineal length of the member's slip or boat, whichever is larger. Members of Yacht Club also contribute a minimum of 20 hours of volunteer work each year. A member who does not meet this annual volunteer obligation pays a penalty of $40 for each unworked hour. All members pay an initiation fee and annual dues of $500.

In 2012, the Erie County Bureau of Assessment proposed to assess the property at $963,200. After an appeal by Yacht Club, the Board reduced the assessed value to $635,200, effective January 1, 2013. Yacht Club appealed to the trial court, asserting that the assessment was "excessive [and] inappropriately high."[1] R.R. 14a. The School District intervened, requesting a higher assessment.

---

[1] Yacht Club alleged, in a pretrial narrative filed with the trial court, that the previous assessed value of the subject property was $100,000, effective January 1, 2003. C.R., Item 23, at 2.

**Pre-Trial Motion Regarding Floating Docks**

After discovery, the School District and the Board filed a pre-trial motion seeking "to declare [Yacht Club's] floating docks as taxable real estate and/or fixtures." R.R. 16a. Yacht Club responded that the floating docks are personalty, quoting a decision of the trial court in another case, *i.e.*, *In re Appeal of Erie-Western Port Authority and Bay Harbor Marina*, 78 Erie C. L.J. 94 (No. 1594-A-1989) (*Bay Harbor*).

The trial court conducted an evidentiary hearing to determine whether there were any factual differences between the instant case and the *Bay Harbor* decision as well as to receive "any evidence related to whether the floating docks are affixed to the real estate as fixtures." Trial Court Order, 11/16/2016; R.R. 30a. The Board presented the testimony of Scott Maas, a certified Pennsylvania real estate appraiser and the director of the county assessment office. He testified that his assessment did not include the value of the floating docks.

The School District presented the testimony of David R. Lloyd, Jr., a certified real estate appraiser.[2] Lloyd opined that it is "very labor intensive" to install and remove the floating dock system. Notes of Testimony (N.T.), 1/23/2017, at 129. Lloyd noted that electrical lines "feeding out into the main docking area" could not

---

[2]At the hearing, the School District's counsel moved to qualify Lloyd "as an expert in the field of real estate appraisal to render an opinion to a reasonable degree of certainty … that the floating docks and dock system located at [Yacht Club] actually constitute fixtures[.]" Notes of Testimony (N.T.), 1/23/2017, at 115, 121. The trial court allowed the testimony but stated that whether the floating docks are personalty or fixtures is "the ultimate question for the Court to decide." *Id.* at 115. It has been well established that expert testimony may assist the court to determine a factual matter, but the court alone decides questions of law. *See* PA. R.E. 702(b) (allowing specialized knowledge of expert witness to assist trier of fact to understand evidence or determine a fact in issue). The question of whether property is realty or personalty "is *a question of law* to be based on the facts as to the property owner's manifest conduct." *Wilson v. Ridgway Area School District*, 596 A.2d 1161, 1164 (Pa. Cmwlth. 1991) (emphasis added).

easily be disconnected. *Id.* at 131-32. Further, the metal collars that surround the 200 pilings would have to be unbolted to separate the docks from the pilings. The gangways bolted to the bulkheads on land would also need to be removed to free the floating docks.

Yacht Club presented the testimony of its treasurer, Henry W. Bujalski. He testified that the docks were floated to staging areas and then connected using a cotter pin system. He stated that the pins can be removed without special equipment. The main docks are about 40 feet long and 10 feet wide. Finger piers are the narrower docks dividing the slips that provide access to the boats. Bujalski explained that to keep the floating docks in place, pilings were pounded into the basin floor to a depth of approximately 42 inches. The floating docks are not attached to the pilings; instead, the docks "ride on a roller system up and down the [pilings]" based on the water levels. *Id.* at 86.

Bujalski testified that the floating docks are not removed in winter. On occasion, the finger piers have been "lifted out of the water" for repairs by using a pontoon boat. *Id.* at 78. According to Bujalski, there is no reason to remove the docks other than "obsolescence and normal repair and maintenance." *Id.* at 106. The docks have not reached critical obsolescence, although one of the main docks may have to be "pull[ed]" out because of damage. *Id.* at 105. Bujalski further stated that some of the floating docks will need to be reconfigured to accommodate larger boats. The parties agreed that the floating docks can be removed without damage to the realty or the docks.

By order of February 6, 2017, the trial court denied the motion of the School District and the Board to have the floating docks declared taxable realty. The trial court reasoned that the facts in the present case could not be distinguished from

4

those in *Bay Harbor* and, further, Section 8811(a) of the Consolidated County Assessment Law (Assessment Law),[3] 53 Pa. C.S. §8811(a), does not identify floating docks as taxable real estate.

## Hearings on Assessment Appeals

The trial court then held two hearings on November 21, 2017, and January 16, 2018, on Yacht Club's assessment. Maas, the Board's appraiser, testified that the subject property is assessed at $635,200, which consists of $292,650 for the land (dry land and water lots) and $342,550 for buildings and improvements. The assessment record for the property was introduced as evidence.

Maas testified that to assess the value of the land, he "looked at the values across the waterfront" and determined the value "by neighborhooding them to what we could find in the marketplace of property that sold over time." N.T., 11/21/2017, at 10. Maas did not consider the lease between the Port Authority and Yacht Club; rather, he compared the subject property to waterfront properties "that were actually sold." *Id.*

Maas testified that he used an income approach to set a fixed value of $8,283 per boat slip. He determined the income per boat slip by looking to the revenue a boat slip generates in the Erie marina market. He used a similar method to value the parking lot spaces. Maas used a cost approach to assess the value of the buildings and improvements on the property less depreciation for age and condition. Maas also considered the location of the subject property but not the profits generated by the marina's operations. Maas testified that he uses the same approach to evaluate all marinas in Erie County.

---

[3] The Assessment Law, enacted on October 27, 2010, and effective January 1, 2011, applies to the counties of the second class A, third, fourth, fifth, sixth, seventh and eighth classes. 53 Pa. C.S. §8801(b)(1)(i). Erie County is a third class county.

5

Yacht Club presented the testimony of Robert Glowacki, a certified appraiser. He assessed the property at $940,570 for the year 2013, which declined to $576,789 for the year 2017. As did Maas, Glowacki used the cost approach to determine the value of the buildings and improvements on the property. To value the land, he used the income approach. In doing so, he first calculated the gross rental amount Yacht Club paid to the Port Authority, which was $80 per boat slip annually from 2011 through 2015, and $90 per boat slip for the years 2016 through 2020. He then reduced that amount by 2% to account for management and administrative expenses. The net figure was then divided by a capitalization rate of 7%. Using these calculations, Glowacki arrived at a land value of $193,000 for tax years 2013 through 2015 and $217,000 for tax years 2016 through 2017.

Glowacki testified that he did not consider the annual boat slip fees collected by Yacht Club. Rather, he considered only the Port Authority's income from its lease with Yacht Club. Glowacki explained that he did not consider Yacht Club's income from the boat slips because floating docks are "trade fixtures." N.T., 11/21/2017, at 88.

Lloyd, the School District's appraiser, assessed the property at $1,700,000 for the tax year 2013, and $1,715,400 for 2017. He testified that he used the cost approach to assess the buildings and improvements, and he used the income capitalization approach to assess the land. Lloyd first set a leased fee value of the property based on the annual rent paid to the Port Authority.[4] Lloyd then valued the

---

[4] A "leased fee" is "[a]n ownership interest held by a landlord with the right of use and occupancy transferred by the lease to others." *Tech One Associates v. Board of Property Assessment, Appeals and Review of Allegheny County*, 53 A.3d 685, 688 n.8 (Pa. 2012) (*Tech One*) (quotations omitted).

6

property's leasehold interest, which is "what can be leased on the property."[5] *Id.* at 204. In doing so, Lloyd calculated all potential income that Yacht Club could derive from a "for-profit marina," including boat slip fees, guest dockage and boat storage. *Id.* at 193, 205. He testified that his methodology establishes the market price that a potential marina purchaser is willing to pay.

Bujalski responded that Yacht Club does not charge its members for boat storage, which is included as "a benefit of membership." *Id.* at 34. Bujalski explained:

> *[Y]ou actually have to look at the whole picture, because everybody bills their revenue picture differently.* Meaning, we charge work party, some don't. Some emphasize higher dues. Some for-profit marinas don't have dues, because it's not membership, therefore they have a higher dockage rate. So we have to look at the whole picture and culmination in terms of what the total cost is. Some charge for a per square foot, versus a foot long base. Some charge for air conditioning, electricity use. So everyone's a little different.

*Id.* (emphasis added). All parties agreed that the highest and best use of the subject property is as a private marina.

### Trial Court Opinion

In an opinion and order dated June 12, 2018, the trial court upheld the Board's assessment of $635,200. The trial court rejected the testimony of Glowacki because he did not consider the income Yacht Club received from the boat slip fees, which the trial court found integral to the valuation of a private marina. Although the floating dock system is not itself taxable, it "play[ed] [a role] in determining the

---

[5] A "leasehold interest" is "[t]he interest held by the lessee (the tenant or renter) through a lease transferring the rights of use and occupancy for a stated term under certain conditions." *Tech One*, 53 A.3d at 689 n.13 (quotations omitted).

assessment value of the subject property under the income capitalization approach." Trial Court op. at 7. The trial court found that Glowacki engaged in an improper value-in-use analysis "driven by the conscious efforts of a non-profit to keep the costs to its membership as low as possible," which resulted in an understated valuation of the subject property. *Id.* at 29.

The trial court rejected Yacht Club's argument that it was double taxation to consider both its leasehold interest and the Port Authority's rental income. The trial court held that *Tech One*, 53 A.3d 685, established that a taxpayer's leasehold interest is integral to an assessment. The trial court also rejected Yacht Club's argument that a leasehold interest is not a specifically enumerated object of taxation under Section 8811(a) of the Assessment Law.

The trial court rejected Lloyd's valuation analysis as overstated. The trial court found that Lloyd had also engaged in a value-in-use analysis "based solely on the perspective of a for-profit marina motivated to charge for all possible forms of revenue." Trial Court op. at 29. By including the income that other marinas generate for guest moorings and boat storage, Lloyd overlooked the fact that "these fees may be built into the value of a boat slip in the open market." *Id.* at 27. The trial court credited Bujalski's testimony that all marinas set their fees in different ways. The trial court found that it is appropriate to use boat slips to establish the value of a marina, as Maas did in his assessment. *Id.* at 9.

The trial court reasoned that the marketplace contains a "blend of non-profit and for-profit marinas," but neither Glowacki nor Lloyd "provided a credible picture of the assessed value of a marina in this blended market." *Id.* at 29. The trial court concluded that neither Yacht Club nor the School District rebutted the Board's assessed value.

8

The School District and the Board appealed to this Court. Yacht Club cross-appealed.

## I. School District and the Board's Appeal

On appeal,[6] the School District and the Board raise two issues. First, they argue that the trial court erred in rejecting the School District's expert evidence. Second, they challenge the trial court's refusal to declare the floating docks as fixtures. We address these issues *seriatim*.

## A. Lloyd's assessment and expert testimony

The School District and the Board first challenge the trial court's rejection of Lloyd's assessment. That Yacht Club is a nonprofit entity is irrelevant because the property had to be valued upon the "highest and most profitable use." School District Brief at 31, 35 (quoting *Pennypack Woods Home Ownership Association v. Board of Revision of Taxes*, 639 A.2d 1302 (Pa. Cmwlth. 1994) (*Pennypack*)). Further, Lloyd correctly applied the income capitalization approach by considering all potential income that Yacht Club could derive from the real estate, such as fees for guest moorings and winter storage. At the same time, Lloyd excluded the income derived from boat cleaning revenue, membership dues and miscellaneous sales, which did not relate to the real estate. The School District contends that the trial court "did not and could not point to any impermissible revenue stream that was included in Mr. Lloyd's income approach to value." School District Brief at 41. Yacht Club responds that the School District seeks, in essence,

---

[6] This Court's review determines whether the trial court abused its discretion, committed an error of law, or rendered a decision unsupported by substantial evidence. *Walnut-Twelve Associates v. Board of Revision of Taxes*, 570 A.2d 619, 622 (Pa. Cmwlth. 1990). The trial court, as fact-finder, has discretion over evidentiary weight and credibility determinations. *1198 Butler Street Associates v. Board of Assessment Appeals, County of Northampton*, 946 A.2d 1131, 1138 n.7 (Pa. Cmwlth. 2008).

"to hypothecate and tax a business operation predicated on presumed rentals." Yacht Club Second Brief at 14.

In a tax assessment appeal, the trial court proceeds *de novo*. *Murtagh v. County of Berks*, 715 A.2d 548, 552 (Pa. Cmwlth. 1998). Once the taxing authority's assessment is admitted into the record, it has made the *prima facie* case on the assessment. The burden then shifts to the appellant to present sufficient, competent, and credible evidence to overcome the taxing authority's *prima facie* case. *Deitch Company v. Board of Property Assessment*, 209 A.2d 397, 402 (Pa. 1965).

The Assessment Law requires that real property be assessed at its "actual value." 53 Pa. C.S. §8842. The actual value is a parcel's fair market value, which has been defined as "the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied." *Harley-Davidson Motor Company v. Springettsbury Township*, 124 A.3d 270, 279 (Pa. 2015). The Assessment Law authorizes three approaches to a valuation: (i) the cost approach; (ii) the comparable sales approach; and (iii) the income approach, which divides a subject property's annual net rental income by an investment rate of return. 53 Pa. C.S. §8842(b); *Harley-Davidson*, 124 A.3d at 279. A trial court has discretion to decide which method of valuation is most appropriate for a given property. *Aetna Life Insurance v. Montgomery County Board of Assessment Appeals*, 111 A.3d 267, 278 (Pa. Cmwlth. 2015).

When determining fair market value, the property tax assessment "must include *all* relevant factors having a bearing on that value." *Harley-Davidson*, 124 A.3d at 283. The assessment must include "the *entire* property and not merely its

10

constituent elements." *Tech One*, 53 A.3d at 700. The property must be valued based upon its current use even where an appraiser opines that the highest and best use of the property is different. *Harley-Davidson*, 124 A.3d at 280-81 (the "ways in which a property hypothetically could be used by potential buyers are properly considered by an expert in evaluating what a willing buyer would pay for a property; however, the subject property should not be valued as though it were already in that hypothetical condition.").

Here, the Board's appraiser, Maas, testified that he assessed the property at $635,200, which consisted of $292,650 for the land (dry land and water lots) and $342,550 for the improvements. Because the property assessment record was admitted into evidence, the burden then shifted to the School District to present evidence sufficient to overcome the Board's *prima facie* case. *Deitch Company*, 209 A.2d at 402.

The School District argues that Lloyd's expert testimony constituted "more than sufficient competent evidence" to overcome the presumed validity of the taxing authority's assessed value. School District Brief at 42. Lloyd's evaluation is based upon "market data" collected from his "extensive research on the marketplace." School District Brief at 32-33. However, the School District does not challenge Maas' opinion on market value. Maas testified that he established a value of $8,283 per boat slip based upon the revenue a slip generates in the Erie marina market. Maas also considered the location of the marina, "looked at the values across the waterfront" and determined the value "by neighborhooding them to what we could find in the marketplace of property that sold over time." N.T., 11/21/2017, at 10. The School District did not present any evidence to show how Maas' analysis was flawed.

11

The School District argues that the trial court improperly rejected Lloyd's consideration of all potential income that could derive from the real estate. However, the trial court credited Bujalski's testimony that marina fees vary because some marinas, such as Yacht Club, build extraneous fees into the boat slip fees while others may keep their slip fees as low as possible. The trial court, as the fact-finder, has discretion in matters of credibility and evidentiary weight. *1198 Butler Street Associates*, 946 A.2d at 1138 n.7. Here, the trial court's factual findings are supported by substantial evidence and will not be disturbed.

The School District's reliance on *Pennypack*, 639 A.2d 1302, is misplaced. In that case, a nonprofit housing cooperative providing affordable housing to veterans and defense workers appealed its real estate tax assessment. The trial court set the assessment without considering the cooperative's articles and by-laws, which imposed restrictions on income and transferability of ownership of its real estate. On further appeal, this Court affirmed and held that the cooperative's restrictions were "self-imposed," which "should not act to keep the real estate taxes arbitrarily low." *Id.* at 1305.[7]

---

[7] The *Pennypack* court further distinguished the case from *In re Johnstown Associates*, 431 A.2d 932 (Pa. 1981) (*Johnstown*), and *Appeal of Marple Springfield Center, Inc*., 607 A.2d 708 (Pa. 1992) (*Marple*). *Johnstown* involved a low-income apartment building subsidized through the Department of Housing and Urban Development (HUD). HUD set the rents below the prevailing rate for comparable non-subsidized units and restricted the transferability of the units. The Supreme Court in *Johnstown* held that the income and transferability restrictions must be considered for purposes of real estate tax assessment. *Marple* involved a shopping center being leased on a long-term basis for less than its current market value. The taxpayer's predecessor in title had entered into a lease with its anchor tenant under which the tenant had options to renew the lease at a fixed low rent until the year 2044. The Supreme Court in *Marple* extended its holding in *Johnstown* and held that tax assessors of any property should consider legally binding rent restrictions, regardless of whether the restrictions are due to federal regulation, because a buyer cannot "anticipate income at current market levels." *Marple*, 607 A.2d at 709. The *Pennypack* court found that the above-described restrictions came from "an outside force" and must be considered when appraising a property; by contrast, the cooperative's restrictions on income and

*Pennypack* stands for the principle that a property must be assessed at its actual value. Here, contrary to the School District's argument, Maas' assessment did not rely on Yacht Club's income restrictions or its nonprofit status; rather, he assessed the property's market value by considering "the values across the waterfront" and the income that boat slips generate in the Erie marina market. N.T. 11/21/2017, at 10. In upholding the Board's assessment, the trial court rejected Glowacki's valuation as understated because it was "driven by the conscious efforts of a non-profit to keep the costs to its membership as low as possible." Trial Court op. at 29. *Pennypack* is inapposite.

The trial court's findings are supported by substantial evidence, and thus, we affirm its conclusion that the School District failed to rebut the Board's *prima facie* case.

## B. Floating docks

The School District and the Board argue, next, that the trial court erred in concluding that the floating docks were not fixtures subject to real estate taxation. They contend that the trial court's conclusion is at odds with this Court's decision in *In re Sheetz, Inc.*, 657 A.2d 1011 (Pa. Cmwlth. 1995). The Yacht Club counters that *Sheetz* is distinguishable from the case at bar. In any event, the trial court correctly held that Section 8811(a) of the Assessment Law does not identify the floating docks as taxable real estate.

---

transferability were "self-imposed" in light of the cooperative's power to amend its by-laws and articles. *Pennypack*, 639 A.2d at 1305.

Although the present case also involves a long-term lease for below-market rent, *Marple* is distinguishable in that it did not involve real estate that was owned by a lessee; rather, the landowner (taxpayer) in that case owned both the parcel of land and the shopping center built thereon. Our Supreme Court held that *Marple* does not preclude the valuation of real estate that is owned as a leasehold interest. *Tech One*, 53 A.3d at 687.

Section 8811(a) of the Assessment Law provides as follows:

(a) Subjects of taxation enumerated.—Except as provided in subsection (b), all subjects and property made taxable by the laws of this Commonwealth for county, city, borough, town, township and school district purposes shall, as provided in this chapter, be valued and assessed at the annual rates, including all:

(1) Real estate, namely:

> (i) houses;
>
> (ii) house trailers and mobile homes permanently attached to land or connected with water, gas, electric or sewage facilities;
>
> (iii) buildings permanently attached to land or connected with water, gas, electric or sewage facilities;
>
> (iv) lands, lots of ground and ground rents, trailer parks and parking lots;
>
> (v) mills and manufactories of all kinds, furnaces, forges, bloomeries, distilleries, sugar houses, malt houses, breweries, tan yards, fisheries, ferries and wharves;
>
> (vi) all office buildings;
>
> (vii) that portion of a steel, lead, aluminum or like melting and continuous casting structure which encloses or provides shelter or protection from the elements for the various machinery, tools, appliances, equipment, materials or products involved in the mill, mine, manufactory or industrial process; and
>
> (viii) telecommunication towers that have become affixed to land.

(2) All other things now taxable by the laws of this Commonwealth for taxing districts.

53 Pa.C.S. §8811(a). As noted by the trial court, Section 8811(a) of the Assessment Law does not identify floating docks as taxable real estate. Nevertheless, chattel that is affixed to the land can become real estate for purposes of a tax assessment. *Sheetz*, 657 A.2d at 1013. The question of whether property is realty or personalty is one of law "to be based on the facts as to the property owner's manifest conduct." *Wilson v. Ridgeway Area School District*, 596 A.2d 1161, 1164 (Pa. Cmwlth. 1991).

*Sheetz* involved a question of whether canopies covering gasoline pumps at a service station became part of the taxable real estate under the former Fourth to Eighth Class County Assessment Law.[8] This Court looked to *Clayton v. Lienhard*, 167 A. 321 (Pa. 1933), where the Supreme Court identified three classes of chattel: (1) furniture and similar items, which are always personalty; (2) items annexed to the building or land to the extent they could not be removed without causing material injury to the realty or themselves, which are always realty; and (3) items affixed to the realty that can be removed without damaging the item or the realty, which items can be either realty or personalty, depending on the circumstances. *Sheetz*, 657 A.2d at 1012-13.

Because the gas pump canopies fell into the third category, this Court considered: (1) the manner by which the canopies were affixed to the land; (2) whether the canopies were essential to the property's use as a gas station; and (3) whether the canopies were intended to be permanent. *Id.* at 1013. Among these factors, the intention of the parties is of "paramount importance." *Id.* at 1014. This Court explained:

---

[8] Act of May 21, 1942, P.L. 571, *as amended*, formerly 72 P.S. §§5453.101 - 5453.706, repealed by the Act of October 27, 2010, P.L. 895.

15

> The prior considerations—the manner in which the property is affixed and the reason it is done in the particular situation—can be looked at as merely objective manifestations that aid in determining the intention of the parties. That is so because the intention of the party is not so much what a particular party intended his legal rights to be, as it is what intended use of the property was manifested by the conduct of the party. The permanence required is not equated with perpetuity. Just because they have been and can be moved does not mean the intention was not to make them permanent. It is sufficient if the item is intended to remain where affixed until worn out, until the purpose to which the realty is devoted is accomplished or until the item is superseded by another item more suitable for the purpose.

*Id*. (internal quotations and citations omitted).

We concluded in *Sheetz* that canopies were realty. Weighing between 20 and 35 tons each, the canopies were mounted on pillars attached to the ground by bolts sunk in a poured concrete foundation, which, in turn, were also covered with concrete. Although the canopies could be removed with little damage to the real property, significant effort would have been required to disassemble them into component parts while leaving the poured concrete foundation in place. The record did not indicate that anyone intended to remove the canopies as long as the property was being used as a gasoline station.

Here, it is undisputed that the water lots are "lands" subject to real estate taxation under Section 8811(a) of the Assessment Law. 53 Pa.C.S. §8811(a)(1)(iv). The question is whether the floating docks are so affixed to the water lots that they have become part of the real estate for tax assessment purposes. The trial court concluded that the evidence presented by the School District and Board did not "distinguish this case from the precedent set in the *Bay Harbor* case[, 78 Erie C. L.J. 94]." Trial Court Order, 2/6/2017, at 1. In that case, Bay Harbor Marina installed

16

floating docks by fastening individual modules of sheet aluminum together. The sheet aluminum modules floated on the water surface and were kept in place by bolts attaching them to pilings driven into the harbor bottom. The floating docks could be adjusted to form different configurations and were routinely removed during the winter months, without damage to the adjacent land or to the docks themselves. Bay Harbor Marina was allowed to remove the floating docks at the end of the lease term. In *Bay Harbor*, the trial court held that the floating docks were personalty.

Likewise, here, Bujalski testified that the floating docks are fastened together by a system of cotter pins, which can be removed without special equipment. The docks are not attached to the pilings but "ride on a roller system up and down the [pilings]" based on the water levels. N.T., 1/23/2017, at 86. Docks can be removed without damage to the land and can be adjusted to form different configurations. Bujalski testified that certain parts of the floating docks would be reconfigured to accommodate larger boats. Further, the lease allows Yacht Club to remove the floating docks at the end of the lease term. Finding Yacht Club's floating dock system similar to that in *Bay Harbor*, the trial court adopted the holding in *Bay Harbor* that the floating docks were personalty.

The School District and the Board argue that the trial court erred in this holding because it did not follow *Sheetz*, 657 A.2d 1011. Notably, the *Bay Harbor* analysis used the three-part *Sheetz* test to conclude that the floating docks were personalty. *See Bay Harbor*, 78 Erie C. L.J. at 98 (quoting *Appeal of Penn-Lehigh Corporation Upon Washington Township Route 29, Lehigh County*, 159 A.2d 56 (Pa. Super. 1960) (discussing three classes of chattel in connection with real estate)), and *Noll by Noll v. Harrisburg Area YMCA*, 643 A.2d 81 (Pa. 1994) (discussing the three-part test in determining when a chattel becomes a fixture). In any case, *Sheetz*

17

is distinguishable. Unlike the canopies, which were mounted on pillars attached to the ground by bolts sunk in a poured concrete foundation, the Yacht Club's docks are not attached to the pilings but float on the water. Although essential to the use of the property as a marina, the floating docks are not intended to be "affixed until worn out" or "until the purpose to which the realty is devoted is accomplished." *Id.* at 1014. Rather, they have been lifted out of the water for repair and can be reconfigured or disassembled with no damage to the property.

We affirm the trial court's holding that Yacht Club's floating docks constituted personalty, not realty.

## II. Yacht Club's Cross-Appeal

On cross-appeal, Yacht Club raises two issues for our consideration, which we consolidate for our analysis. It argues that its leasehold interest is not taxable real estate under the Assessment Law and that the trial court erred in relying on *Tech One*, 53 A.3d 685, which distinguished "leased fee" and "leasehold" interest "in the context of making clear that items meeting the statutory definition of 'real estate' are taxable regardless of who owns or holds an interest in them." Yacht Club Brief at 19. Because Yacht Club has not entered into a lease with third parties, the trial court erred by setting its leasehold value on the basis of "a presumed rental." *Id*. at 24 (quoting *Downingtown Area School District v. Chester County Board of Assessment Appeals*, 131 A.3d 152 (Pa. Cmwlth. 2015) (*Downingtown*)). Yacht Club contends that its appraiser, Glowacki, has assessed the entire 16 acres of land, consisting of both the dry land and the water lots. Considering the property's leasehold interest results in taxing the land twice.

The School District and the Board counter that Yacht Club's leasehold interest generates annual income "significantly more" than the rent it pays to the Port

18

Authority. School District Brief at 22. The slip fees are tantamount to a lease, regardless of what Yacht Club calls them. Thus, the trial court correctly followed *Tech One* by using the Port Authority's leased fee interest and Yacht Club's leasehold interest to value the real estate.

Yacht Club contends that its leasehold interest, in the form of boat slips, is not taxable real estate under the Assessment Law. Our Supreme Court's decision in *Tech One* is directly on point.

In *Tech One*, the taxpayer purchased undeveloped land and entered into a 50-year lease agreement with a developer that constructed buildings, which were then sublet to tenants. To determine the fair market value of the property, the taxpayer proposed to capitalize the annual rental income it received from the developer under the lease. *Tech One*, 53 A.3d at 688-89. The taxpayer argued that the buildings and improvements were not taxable real estate because they were owned by the developer, not the taxpayer. The Supreme Court rejected this argument, holding, *inter alia*, that it is the "elemental physical characteristics of a particular property, i.e., its structure and features, which are determinative of whether it constitutes one of the specifically enumerated types of real estate in [the General County Assessment Law]."[9] *Id.* at 697. The mere fact that the buildings and improvements to the land were owned by the developer did not alter the fact that the buildings were a type of real estate enumerated in the General County Assessment Law.

---

[9] Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. §§5020-1 - 5020-602. The General County Assessment Law was repealed insofar as it relates to second class A, third, fourth, fifth, sixth, seventh and eighth class counties, by Section 6(1)(ii) of the Act of October 27, 2010, P.L. 895, known as the Consolidated County Assessment Law, 53 Pa. C.S. §§8801-8868, effective January 1, 2011.

The Supreme Court upheld the methodology that aggregated the value of the taxpayer's leased fee interest and the value of the developer's leasehold interest. *Tech One*, 53 A.3d at 701. It rejected the taxpayer's proposal to consider only the value of taxpayer's "income stream over the life of the lease and the value of its reversionary interest at the end of the lease term." *Id.* at 688-89. The Supreme Court explained that "the market value of the *entire* tax parcel" consisted of the land and the improvements and, thus, "the value of any portion which is owned as a leasehold interest could [not] be disregarded." *Id.* at 703.

Here, since 1976 the Port Authority has leased the property to Yacht Club, which has constructed the marina and created boat slips for its members. Yacht Club proposes to assess the property by capitalizing the annual net rental income that the Port Authority receives under the lease, *i.e.*, the contract rent the Port Authority receives over the term of the lease and its reversionary interest. The parties agreed that the highest and best use of the subject property is as a private marina; thus, the Port Authority's leased fee interest alone is not determinative of the value of the marina. Indeed, in assessing fair market value, "all uses to which the property is adapted and might in reason be applied" must be considered. *Harley-Davidson*, 124 A.3d at 279. In sum, the trial court's consideration of Yacht Club's leasehold interest to determine the value of the property is fully consistent with *Tech One*.

Yacht Club next argues that unlike *Tech One*, in which the buildings and improvements that the developer constructed during the lease term were real estate subject to taxation, its leasehold interest consists of boat slips, which are not identified as taxable under Section 8811 of the Assessment Law. This argument ignores the fact that the water lots are "lands" subject to taxation under the

20

Assessment Law. 53 Pa. C.S. §8811(a)(1)(iv). To ascertain the fair market value of the water lots, "all relevant factors having a bearing on that value" must be considered. *Harley-Davidson*, 124 A.3d at 283. Section 8811 does not foreclose consideration of the income that water lots can realize from boat slips. *See In re Consolidated Appeals of Chester-Upland School District*, 200 A.3d 1052 (Pa. Cmwlth. 2018) (the fact that Section 8811(b)(4) of the Assessment Law excludes advertising signs from taxation does not exclude consideration of any potential income that a property owner may receive from the placement of the sign on the property to determine the fair market value).

Alternatively, Yacht Club argues that because it has not entered into any subleases, its leasehold value must be assessed at zero, as was done in *Downingtown*, 131 A.3d 152. In that case, the owner of a 2.66-acre parcel constructed a one-story building and a parking lot and entered into a long-term lease of the premises to a pharmacy. The lease rental was 58.5% above market rate, and the pharmacy was responsible for paying the real estate taxes for the property. The pharmacy had no subtenants and no rental income. The pharmacy argued that because the rent was above-market, it had a "negative leasehold," which should be assessed a negative value. Relying on *Tech One*, we held that both the property owner's leased fee interest and the pharmacy's leasehold interest must be considered in assessing the property. The pharmacy did not sublease the space, and the economic reality was that "a willing buyer would pay $0 for the lease because no one would be interested in paying above-market rent." *Downingtown*, 131 A.3d at 157. However, the pharmacy's payment of above-market rent did not have a negative effect on the value of the property.

21

*Downingtown* is distinguishable. Although Yacht Club members do not execute a "lease," they pay an annual fee to use and occupy a specified area within the water lots, in the form of boat slips. Further, there are key differences between the economic realities of *Downingtown* and the present case. In *Downingtown*, the pharmacy was paying above-market rent, and the trial court found that "a willing buyer would pay $0 for the lease." *Id.* Here, Yacht Club does not dispute that it has been paying below-market rent to the Port Authority and has a positive leasehold interest.

For these reasons, we conclude that the trial court properly considered Yacht Club's leasehold value to determine the fair market value of the property and, further, did not overvalue the leasehold interest.

## Conclusion

For the foregoing reasons, the trial court did not err in holding that Yacht Club and the School District failed to rebut the presumption that the Board's assessment of the property was valid. The trial court did not err or abuse its discretion in using both the Port Authority's leased fee interest and Yacht Club's leasehold interest to determine the fair market value of the property. Finally, the trial court did not err in holding that the floating docks are personalty not subject to real estate taxation under Section 8811 of the Assessment Law.

For these reasons, we affirm the trial court's June 12, 2018, order.

_____
MARY HANNAH LEAVITT, President Judge

22

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Erie-Western Pennsylvania Port Authority and Commodore Perry Yacht Club | : | |
| | : | |
| v. | : | No. 960 C.D. 2018 |
| | : | |
| Erie County Board of Assessment Appeals and The School District of the City of Erie | : | |
| | : | |
| Appeal of: The School District of the City of Erie | : | |
| | : | |
| Erie-Western Pennsylvania Port Authority and Commodore Perry Yacht Club | : | |
| | : | |
| v. | : | No. 961 C.D. 2018 |
| | : | |
| Erie County Board of Assessment Appeals and The School District of the City of Erie | : | |
| | : | |
| Appeal of: Erie County Board of Assessment Appeals | : | |
| | : | |
| Erie-Western Pennsylvania Port Authority and Commodore Perry Yacht Club | : | |
| | : | |
| v. | : | No. 1027 C.D. 2018 |
| | : | |
| Erie County Board of Assessment Appeals, School District of the City of Erie | : | |
| | : | |
| Appeal of: Commodore Perry Yacht Club | : | |

# **O R D E R**

AND NOW, this 12th day of July, 2019, the order of the Court of Common Pleas of Erie County, dated June 12, 2018, in the above-captioned matter is AFFIRMED.

_____

MARY HANNAH LEAVITT, President Judge